### UNION GAS & OIL CO. et al. v. ADKINS et al.

(Circuit Court of Appeals, Sixth Circuit.   March 17, 1922.)

No. 3613.

1. **Mines and minerals** ⊜⟹73½—**Lease for "as long as gas and oil is found in paying quantities" construed.**

  The provision that a lease extends "as long as gas and oil is found in paying quantities" means, not merely that those minerals shall be found in paying quantities, but also that either oil or gas shall be actually discovered and produced in paying quantities within the term named in the lease, and if neither oil nor gas is being produced at the end of the term of years named in the lease the lease ends.

2. **Mines and minerals** ⊜⟹73½—**Lessee's determination as to paying quantities of oil is not conclusive.**

  In an oil and gas lease, where the lessor, in return for the burden of the oil well on his premises and the cloud on his title, receives only a percentage of the oil actually produced on the land, the determination of the lessee as to whether oil is being produced· in paying quantities is not conclusive, but that question is to be determined as a question of fact, though the lessee's determination might be conclusive in the case of a gas well, where he paid a stipulated rental for each well, regardless of the production.

3. Mines and minerals ⟨key⟩73½—Inadequacy of shipping facilities considered, in determining whether oil is produced in paying quantities, as affecting term of lease.

The courts, in determining whether oil is produced in paying quantities within the meaning of an oil lease can consider the fact that the well is in "wildcat" territory, where the facilities for shipment may not be fully developed, but can also consider that the parties had that fact in mind in fixing the term for the production of oil on the premises, and intended to require furnishing facilities for shipment within such term.

4. Mines and minerals ⟨key⟩75—Possibility of paying production by central pumping plant held not to extend lease.

Where, at the expiration of the term of years of an oil lease, only one test well had been sunk, in which oil had been found, but which had not produced any oil, except for about a day and a half of pumping, evidence that the oil could be pumped in paying quantities by connecting that well, with other similar wells in the neighborhood, to a central pumping plant, does not show that the oil was being produced in paying quantities, so as to extend the term of the lease.

5. Evidence ⟨key⟩568(4)—Opinions of witnesses as to oil production before test well was shot disregarded.

In determining whether oil was being produced in paying quantities at the expiration of the term of years fixed by oil lease, opinions of witnesses, given before the test well was shot, as to the quantity of oil it would produce, are disregarded, since the object of requiring the test well and the production of oil was to eliminate the necessity of relying on opinions as to production.

6. Mines and minerals ⟨key⟩78(7)—Evidence held not to show production of oil in paying quantities.

Evidence that at expiration of term of years prescribed in an oil lease one test well had been sunk, from which oil had been pumped for about a day and a half, without any accurate measurement of the quantity produced, and which well had then been closed and the rig removed, so that no oil was being produced therefrom, held to show that oil was not being produced in paying quantities, so as to entitle lessors to a cancellation of the lease.

7. Mines and minerals ⟨key⟩78(7)—Evidence held to show abandonment of lease.

Evidence held to show abandonment of lease by lessee.

Appeal from the District Court of the United States for the Eastern District of Kentucky at Catlettsburg; Andrew M. J. Cochran, Judge.

Suit by Virgil V. Adkins and others against the Union Gas & Oil Company and another to cancel an oil and gas lease. Decree for complainants, and defendants appeal. Affirmed.

Homer E. Holt, of Huntington, W. Va. (Holt, Duncan & Holt, of Huntington, W. Va., on the brief), for appellants.

S. S. Willis, of Ashland, Ky. (Hager & Stewart, of Ashland, Ky., on the brief), for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge. This is an appeal from the decree of the District Court of the United States for the Eastern District of Kentucky, in an action in equity brought in that court by Virgil V. Adkins et al. against the Union Gas & Oil Company and A. C. Albin, to cancel an oil and gas lease bearing date of June 1, 1916, given by Cynthia A. Rice and her husband, Nelson T. Rice, to A. C. Albin, and afterwards

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

assigned by him to the Union Gas & Oil Company, and to quiet title in plaintiffs to 150 acres of land, more or less, situate on Big Blaine creek, in Lawrence county, Ky. At the time of the execution of this lease Cynthia A. Rice and her husband were and still are the owners of the fee in this land. Virgil B. Adkins, John W. M. Stewart, and John E. Buckingham claim an interest in this real estate under a lease for oil and gas given by Cynthia A. Rice and her husband to Virgil V. Adkins on the 2d day of September, 1919.

The Albin lease, which was delivered in escrow, and under which appellants claim the right to drill for and produce oil from these premises, provided, among other things, that the term of the lease should be for "three years or as long as gas or oil is found in paying quantities on said premises." The lease further provided that, "in case no paying well is drilled on said premises within three years from date, this grant shall be null and void"; also that, "should the second party not begin drilling a test well on said land within two years from this date, then it is understood and agreed that this lease shall be marked 'canceled' and returned to the first party."

The drilling of the test well was not commenced within two years, but for a valuable consideration the lessors extended the period until December 1, 1918. In July and August of 1918, a test well was driven to the depth of 833 feet. It is the claim of the appellees that this well did not produce oil in paying quantities, and that the appellants abandoned the premises and the well drilled thereon, and made no further efforts to find oil or gas in paying quantities within the three-year term of the lease. The Union Gas & Oil Company, assignee of the Albin lease, denies that it abandoned this property, and contends that oil was found in paying quantities in the test well drilled in July and August of 1918. Upon these issues the District Court found upon the evidence for the plaintiffs, and entered a decree canceling this Albin lease, and quieting the title of the plaintiffs appellees to the premises described in the petition.

This record therefore presents but two questions. First. Was oil being found on these premises in paying quantities within the three-year term named in the lease? Second. Did the assignee of the lessee abandon the premises after the drilling of the test well?

[1] The provision "as long as oil and gas is found in paying quantities on the premises" is a familiar term in oil and gas leases, and has been judicially construed to mean, not merely that oil or gas shall be found in paying quantities, but also that either oil or gas shall be actually discovered and produced in paying quantities within the term named in the lease. Murdock-West Co. v. Logan, 69 Ohio St. 514, 69 N. E. 984; Detlor et al. v. Holland, 57 Ohio St. 492, 49 N. E. 690, 40 L. R. A. 266; Gas Co. v. Tiffin, 59 Ohio St. 420, 54 N. E. 77; Cassell v. Crothers, 193 Pa. 359, 44 Atl. 446. It necessarily follows that, if neither oil nor gas is being produced at the end of the term of years named in the lease, the lease ends and determines at the expiration of that time. If oil or gas is then being produced in paying quantities, the term of the lease is extended during the time production in paying quantities is continued.

[2] It is contended on the part of the appellant that the question of whether oil or gas is produced in paying quantities is one solely for the determination of the lessee. There is some force in this contention in so far as it applies to gas wells, where the contract provides that the lessor shall receive a fixed annual rental for each gas well, and the lessee is ready and willing to pay that rental. In such case the landowner receives the same revenue from the operation of his land as he would receive if the gas well were in fact a paying one to the lessee. But no such rule can obtain in reference to an oil well, where the lease provides that the sole profit arising to the owner of the land from such operation shall consist of a part of the oil produced and marketed from the premises. The right to operate for oil is a burden upon the land and materially interferes with the owner's use of the same for agricultural purposes. It may also injuriously affect the market value of the property. Therefore whether oil is found in paying quantities is a question of fact, to be determined from all the evidence in the case with reference to the rights of the lessor as well as the lessee, and not a question for the sole and arbitrary determination of the lessee. The fact, however, that the lessee has spent a large amount of money in the test well, and, with knowledge of the quantity of the oil it will produce, is still willing to go forward with reasonably prompt development of the land, will necessarily have great weight with the court in determining this question; but it cannot be accepted as conclusive of that fact.

In this case it is admitted that the defendant did not go forward with the prompt development of this lease by drilling other wells thereon, but after pumping the well for a day, or a day and a half, after it had been shot, and without actually storing and accurately measuring the oil produced from this well by pumping, removed the drilling rig and water tank to another lease, and attempted no further development of this lease for about 17 months thereafter. Nor did it during this time give any further attention to this well either by pumping or otherwise. This failure to develop this lease in accordance with the implied covenants thereof is explained upon the theory that there was then no pipe line connection to this field, and for that reason the oil could not be marketed.

[3] While the provisions in a lease "as long as oil is found in paying quantities" should be construed to mean, not only the discovery of oil, but also the production of it in paying quantities, nevertheless, in the application of this provision of an oil lease of land in what is substantially "'wildcat'" territory, a court should give due consideration to the inability of the producer to market oil in the usual and ordinary way, until a pipe line is connected with the territory. However, that condition is presumed to be within the contemplation of the parties at the time the lease is made. The term named therein is usually fixed at such a period of years as will enable the lessee to test and develop the territory, so as to procure the laying of a pipe line within the term of the lease. Nevertheless a court of equity would hesitate to decree the cancellation of a lease, where it is clear from the evidence that oil is found in paying quantities in "wildcat" territory, known to the par-

ties to be such at the time of the execution of the lease, and the failure to procure the laying of a pipe line within the term named in the lease, is in no wise chargeable to the delay or default of the lessee in the development of the territory to such an extent as would justify a pipe line company in making this expenditure.

[4] It is the claim of the appellee that this well will produce oil in paying quantities, if it is connected with other wells having like production, to a central pumping power; but that claim can avail nothing, in view of the fact that at the end of the term no oil was being produced in any quantity. It also further appears that appellant has not drilled other wells upon these premises, with which this well can be connected for pumping purposes in order to obtain a paying production. The provision in this lease is that oil shall be found in paying quantities on these premises, not on some other premises, and therefore the economy in operation that may be possible by pumping it in connection with wells on other premises is not controlling in the determination of that question. That is made clear by the further provision of the lease that "in case no paying well is drilled on said premises within three years from date, this grant shall be null and void." Therefore the question of whether oil has been found in paying quantities upon these premises must be determined from the actual conditions that existed upon the leased premises, and not on other premises, at the expiration of the three-year term.

[5] There is considerable evidence in this record tending to show that, when this test well was drilled and before it was shot, it indicated, in the opinion of witnesses, that it would produce from one to two barrels a day. This evidence must be wholly disregarded. This test well was to be drilled for the specific purpose of determining to a certainty just what amount of oil it would produce. The mere drilling of the well was not the test contemplated by the contracting parties. In addition to that it is necessary, where the showing of oil is so slight as to make it questionable whether it is in paying quantities or not, to make an actual test by pumping, storing, and measuring for a time sufficient to determine definitely the real capacity of the well, so that the answer to that question will no longer depend upon opinion or conjecture.

[6] There is no satisfactory evidence in this record tending to prove the actual production of this well during the time it was pumped. It does not appear that the oil was pumped into a tank or other receptacle, so that the quantity thereof could be actually measured. A number of witnesses, who were present during part of the time that this well was being pumped, testified that they saw no oil whatever pumped therefrom, but only water. Mr. Pruitt, the president of the Union Gas & Oil Company, stated in his affidavit that—

"We pumped it one day, and then pumped it the next morning. * * * This morning showed that the well would pump at least two barrels per day, and I believe that pumping it awhile would increase that somewhat."

It is not clear, from his affidavit, whether he was actually present at the time this well was pumped; but, whether he was present or not, it is evident that his statement in reference to the production of oil from

this well is a mere estimate, and not an actual measurement of the quantity produced. Nor is it clear upon what theory he bases his belief that pumping it for awhile would increase that production, especially in view of his evidence on cross-examination to the effect that other wells in that field decreased instead of increased their production in a few weeks after pumping commenced. It is clear, therefore, from all of the testimony in this case, that this test well on the Rice farm was not pumped for a sufficient length of time to determine with any degree of certainty the amount of oil it would produce after it had settled down to its normal capacity, nor is there any evidence in this record from which a court can find that oil was found on these premises in paying quantities within the three years, or was being found in paying quantities at the end of the three-year term named in the lease, even though the failure to produce and market the same, in order to furnish a revenue to the lessor in payment for the burden upon her land, were excused upon the theory that through no fault of the lessee there was, at that time, no pipe line connecting this field with a market.

[7] The court having reached this conclusion, the question of abandonment is not important to the determination of this case. However, there is some evidence tending to establish abandonment by the lessee. The removal of the rig and water tank to another lease, in connection with the failure to develop within a reasonable time by drilling other wells upon this property, tend strongly to prove that the lessee had abandoned this lease, and that if it had any intention whatever of returning thereto it was merely the intention of connecting this well to a central power operating wells on adjoining leases. It also appears from the evidence in this case that a number of wells were drilled by appellant on adjoining leases, that these wells produced more oil than the well on the Rice lease, and that these wells were pumped, at least occasionally, and the oil stored in tanks until pipe line connections could be made.

There is also evidence in this record to the effect that it is necessary to pump wells in this field occasionally in order to protect them from the injurious effect of water, whether salt or fresh water, and that water left standing in a small well in this territory for a period of six months would ruin it. This evidence, taken in connection with the fact that this well was not pumped, except immediately after it had been shot, for a period of about 17 months, would seem to be conclusive of the fact that appellant had abandoned this lease entirely. At least the failure to protect the well and the failure to further develop the lease, or to produce any oil whatever therefrom, within the three-year term, considered together, would not seem to permit of any other logical conclusion.

For the reasons above stated, the judgment of the District Court is affirmed.