# Moritz v. Fisher

26

*Keller & Luxenberg*, for plaintiff.

*Cobau & Berry, Alvah M. Shumaker, Matthews & Matheny*, for defendants.

BRAHAM, P. J., July 25, 1955.—This is an action in equity brought by plaintiff, Daniel A. Moritz, against defendants, Flora E. Fisher, Carmen D'Ambrosia and United States Steel Corporation to enjoin them from interfering with his rights as the owner of an oil lease on Fisher's lands. There are three leases on the Fisher lands: A limestone lease now held by United States Steel Corporation, an oil lease now owned by plaintiff, a lease for the stripping of coal owned by D'Ambrosia. Mrs. Fisher filed an answer denying interference with plaintiff's rights and alleging by way of counterclaim that she was entitled to terminate and did terminate plaintiff's oil lease. The United States Steel Corporation filed an answer denying that it was interfering with plaintiff's rights as did D'Ambrosia.

After a full hearing I make the findings of fact, conclusions of law and decree nisi, and for the reasons hereinafter stated.

### Findings of Fact

1. Plaintiff is Daniel A. Moritz, a resident of McKeesport, Allegheny County; defendants are Flora E. Fisher, of North Beaver Township, Lawrence County, Carmen D'Ambrosia, of Mahoning Township, Lawrence County, and United States Steel Corporation, a New Jersey Corporation.

2. On March 15, 1928, Florence A. Baird and John S. Baird, being the owners of the farm of 80 acres in Mahoning Township, Lawrence County, which is the subject of this action, leased to the G. W. Johnson Limestone Co., predecessor in title of U. S. Steel Corporation, the limestone on said lands. The lease is recorded in Lawrence County in Deed Book vol. 267, **page 112.**

3. On June 6, 1930, the Bairds and G. W. Johnson Limestone Co. entered into a supplemental agreement whereby it was provided that the Bairds might also lease the lands for oil. The agreement is recorded in Deed Book vol. 274, page 414 and appears as exhibit 1 attached to the complaint. A material portion of the agreement is as follows:

"The Bairds further agree that when, in the opinion of the Limestone Company, its operations have progressed to the point where further operations might prove hazardous due to the proximity of a well or wells which are operating or have not been abandoned, they, the said John S. Baird and Florence A. Baird, will, within sixty (60) days after the date of receiving written notice concerning the aforesaid, protect and plug such aforesaid well or wells in the same manner as provided herein for protecting and plugging abandoned wells and if the said John S. Baird and Florence A. Baird fail or neglect to protect and plug a well or wells, as aforesaid, within the time provided, then the limestone company may do so at the expense of the said John S. Baird and Florence A. Baird."

4. On or about July 28, 1930, the Bairds entered into an oil lease of the said lands with William Hedegore. A copy of the lease is attached to the complaint as plaintiff's exhibit 2. The lease granted Hedegore the oil and gas under the lands and the exclusive right to remove them. The habendum clause was as follows:

"To HAVE and to hold unto and for the use of said party of the second part for the term of twenty (20) years from the date hereof, and as much longer as the royalty for each producing well is not less than one half barrel per month, yielding to the said parties of the first part the one-eighth part of all the oil produced and saved from the premises delivered free of expense into tanks or pipe lines, to the credit of the said party of the first part, and should a well be found producing

gas only, then the said parties of the first part shall be paid for each such well at the rate of One Hundred ($100.00) Dollars for each year, so long as the gas is sold therefrom, payable quarterly, while so marketed, provided, however, that this lease shall become null and void unless operations shall be commenced on the premises and a well completed, unavoidable delay or accident excepted, within three (3) months from the date hereof, and that five (5) more wells shall be commenced and completed within six (6) months from the date hereof; and the completion of such well, whether producing or not, shall entitle the lessee to make a further test, rent free, at any time during the term of this agreement above mentioned."

5. Hedegore drilled about 22 wells on the lands. At the time of suit 20 wells remained. They were about 700 feet deep and were pumped by the usual arrangement of power houses, eccentrics, rods and pumping jacks. The oil from all the wells was pumped into a tank. There was no method of measuring the production of any one well. In the early days of the operation Hedegore delivered the oil from the tank into a pipeline whence it was delivered to a refinery. Later he had to deliver it to the refinery by truck.

6. Contemporaneously with the operation of the Fisher lease Hedegore also operated other leases on nearby farms, known as the Hoffmaster and McCord leases. The oil from the two wells on the Hoffmaster lease and from a Fisher well on other property was run into the Fisher tank with no method of determining which well actually produced the oil. The oil from four McCord wells was commingled when it was delivered for sale. In making settlement all the wells were considered as of equal value although the contrary was known to be the fact. It was possible to determine the number of barrels of oil in the Fisher tank by measuring the depth of the oil.

7. In 1942 a life estate in the lands became vested in Florence E. Fisher.

8. Hedegore was accustomed to make payment of the one-eighth royalty due the Bairds and later due Mrs. Fisher, monthly by check. He accompanied the check with a statement of the oil produced during the preceding month. To determine the royalty due them Hedegore averaged the Fisher, Hoffmaster and McCord production.

9. The production of oil fell off materially. The year 1945 was the last year when the wells produced sufficient oil to allow a royalty payment of at least one half barrel of oil from each well monthly. In 1948 the lease was in bad condition, and the wells and equipment were run down. The production dropped until they produced only enough to require less than one third of a barrel of oil royalty for each month. This condition continued thereafter. Modern techniques for reviving the wells by pumping under pressure were too expensive to be practicable.

10. Beginning about 1948, Mrs. Fisher had an arrangement with D'Ambrosia for the mining of coal from her lands. The current renewal of this lease was dated February, 1950. It provided that D'Ambrosia should mine coal by the stripping method, keeping ahead of the quarrying operations of the Steel Corporation.

11. Nothwithstanding his failure to produce the minimum of oil required by the lease, Hedegore continued to report to Mrs. Fisher a production of the minimum amount of oil. This practice continued both before and after the end of the 20-year period fixed by the lease.

12. No agreement for an alteration or extension of the existing lease was entered into between Mrs. Fisher and Hedegore.

13. From September 30, 1950 to September 29, 1951, Hedegore paid to Mrs. Fisher and she received and cashed 10 checks for royalty based on approximately the minimum production required by the lease.

14. In the spring of 1951, Mrs. Fisher began to be suspicious of the accuracy and veracity of Hedegore's reports of production and instituted an investigation of her own which disclosed to her that the wells were not producing the minimum required by the lease as reported by Hedegore but a much smaller amount.

15. On October 14, 1951, Hedegore assigned his oil lease to Moritz with the provision that plaintiff should not be required to pay a substantial part of the purchase price if it was determined that Hedegore's lease had been terminated. After he acquired the lease plaintiff endeavored to repair the wells and improve their production. He did not, however, have the minimum production required by the lease.

16. On January 9, 1952, Mrs. Fisher notified plaintiff in writing that the lease was ended at the conclusion of the 20-year period because the minimum amount of oil was not being produced. She coupled this with a statement that it might be necessary to institute an action to clarify the rights of the parties and an invitation to discuss the matter. A copy of this letter is attached to the transcript of April 18, 1955, as plaintiff's exhibit 5.

17. On June 25, 1952, Mrs. Fisher filed an action of ejectment in Lawrence County at No. 25 September term, 1952, to oust plaintiff from the lands on the ground that his lease was terminated. The suit was never brought to trial but when plaintiff as assignee of Hedegore brought the present action in equity Mrs. Fisher asserted as a counterclaim the same claims advanced in the ejectment suit.

18. From January 10, 1952, to March 23, 1953, plaintiff delivered to Mrs. Fisher 23 checks for royalty

based on approximately the minimum production required by the lease, although the wells were not producing so much. Mrs. Fisher did not cash these checks and did not return, or offer to return, them. She made a statement to the messenger delivering the checks that she was receiving the checks only for the record. During this time Mrs. Fisher used gas from the lease for her household purposes.

19. Return of the 23 checks was tendered by Mrs. Fisher in open court at the time of the trial. The tender was refused by plaintiff.

20. On and prior to May 22, 1953, the quarrying operations of the Steel Corporation had approached close to the north line of Mrs. Fisher's land. The quarry face was about 1,000 feet away and the stripping operations about 50 feet away. Soon thereafter the corporation entered upon her lands and dug a large ditch thereon.

21. D'Ambrosia was digging out coal on the north side of Mrs. Fisher's lands at that time, keeping ahead of the corporation's stripping operations. The effect of the corporation's stripping and D'Ambrosia's digging was to isolate three of the northernmost wells on the Fisher lands.

22. On May 22, 1953, the U. S. Steel Corporation had considered its situation with respect to Mrs. Fisher's lands and plaintiff's oil wells and had arrived at the conclusion that the time had come for it to exercise the right, reserved in the agreement of June 6, 1930, to direct the owner of the oil wells to remove them. Accordingly on May 22, 1955, the corporation, by the manager of its Hillsville Plant, sent a letter to plaintiff and a copy to Mrs. Fisher directing plaintiff to protect and plug his wells. A copy of the letter appears as defendant's exhibit 5 in the transcript of March 25, 1955.

23. The sending of this notice was not planned or requested by Mrs. Fisher or D'Ambrosia but on January 9, 1953, at a conference with the employes of the Steel Corporation, the attorney for Mrs. Fisher did suggest a modified notice to be sent Mrs. Fisher but this notice was never sent. A copy thereof appears in the transcript of April 13, 1955, as plaintiff's exhibit 5.

24. The Steel Corporation never rescinded its notice of May 22, 1953, and never gave notice to Mrs. Fisher, D'Ambrosia or plaintiff that it had changed its mind about the matter until the time of trial. At trial the Steel Corporation admitted that it then considered its said notice to have been prematurely sent, before its needs actually required.

25. On November 3, 1953, Mrs. Fisher did cause and direct D'Ambrosia to remove three of the wells. This was done about December 26, 1953. Two of the wells were pulled and plugged and one was plugged only because it could not be pulled. Four others were disconnected. The material pulled and removed from the wells was preserved but was not handled carefully and lost its value as oil well equipment.

26. The tender by Mrs. Fisher of the royalty checks which had not been cashed was the final act of complete repudiation required of her as an incident to termination of the lease.

27. The reasonable value of the property which plaintiff might have salvaged had he pulled and plugged the wells which D'Ambrosia plugged at Mrs. Fisher's direction was $300 for each well or a total of $900.

28. Plaintiff, the lease having been terminated, will be able to remove all the materials from the other wells, the pumping plant, the tanks and the pipe and rod lines and thus realize its value.

*Discussion*

The controlling point in this case is the nature of the rights of the lessee of the oil lease after the termination of the fixed term of 20 years. The language is significant:

"To have and to hold . . . for the term of twenty years from the date hereof and as much longer as the royalty for each producing well is not less than one half barrel per month, yielding the one-eighth part of all the oil produced and saved from the premises de-·livered free of expense into tanks and pipelines to the credit of the first party."

This language means what it says. If, after the end of the 20-year period, production has fallen to the point where not enough is produced to allow the landowner one half barrel of oil per month for each producing well, the lease no longer continues. There is common sense to this because "The right to operate for oil is a burden upon the land and materially interferes with the owner's use of the same for agricultural purposes. It may also injuriously affect the market value of the property": Union Gas & Oil Co. et al. v. Adkins et al., 278 Fed. 854, 857. In the case at bar the oil lease might easily prevent the owner of the land from ever realizing the value of the coal.

The case is not, as plaintiff contends, one where the lease provides a minimum royalty, which, if paid, continues the case indefinitely. The royalty is payable in oil which is to be delivered to the credit of the landowner. If one eighth of the oil produced does not amount to one half barrel per month per well, the lease is at an end by its own terms. Mr. Hedegore did not believe that the lease provided for a minimum royalty because for a long time he made false reports to the lessor which indicated that more than the minimum of oil was being produced. Only when this was detected

and he could get no new agreement did he fall back on this position.

Nor is the case controlled by the precedents construing the language "in paying quantities": Young v. Forest Oil Co. et al., 194 Pa. 243; Annotations 91 A. L. R. 900, 84 A. L. R. 761; 48 A. L. R. 887. Here the parties have agreed unequivocally as to the line between paying quantities and unpaying quantities. It is eight times half a barrel per well per month or four barrels per well. The wells in question have not produced that amount since 1945.

This is not a question of forfeiture. Plaintiff as a part of his burden of proof had to establish that the wells were producing more than the minimum amount of oil in order to justify a continuance of the lease beyond the 20-year period: Batten v. Campbell et al., 223 Ky. 363, 3 S. W. 2d 760. His failure to do this "operated as a termination of the lease, and its expiration, not through any forfeiture or breach of contract . . . but by the express terms of the contract itself". The language is quoted from Wilbur v. U. S. 54 F. 2d 437.

Two precedents are particularly in point. In Clark et al. v. Wright et al., 311 Pa. 69, 72, the court in holding a lease terminated because gas was no longer marketed off the premises had this to say:

"Where a lessor's compensation is subject to the volume of production, the period of active production of oil or gas is the measure of the duration of the lease. Where lessor's compensation is a definite and fixed amount unrelated to the volume of production, the duration of the lease is not measured by the length of time the mineral is actually extracted and marketed; but by the time during which the lease provides that the lessor shall receive the fixed rental. Under these latter circumstances, it can make no difference to lessor

whether 100 or 1,000,000 cubic feet of gas is produced."

In Cassell v. Crothers, 193 Pa. 359, an oil lease for a fixed term and "as long thereafter as oil is found in paying quantities" was construed to mean that after the fixed term there was a tenancy at will. Either party was free to declare and to demonstrate that oil was no longer being produced in paying quantities, whereupon the tenancy at will ceased. But if a lease is to be terminated, the termination must be absolute. In the case at bar Mrs. Fisher wrote a letter to Hedefore on January 9, 1952, stating that the lease had expired but the declaration was tentative in nature. She sued in ejectment on June 25, 1952. These steps if continued would have terminated the lease. However, after this time she accepted royalties from Hedegore for 10 months and later received royalty checks without cashing them for 23 months more. During part of this time she used gas from the lease for household purposes. These two positions are inconsistent. She could not go forward and halt at the same time. She could not have the benefits of the lease without the burdens also.

The clause of termination was not selfoperating and to terminate the lease required complete and unequivocal action on the part of the lessor. The first such action came with the testimony of Mrs. Fisher in court and the tender of the return of the royalty checks which remained uncashed. The tender was not accepted but from this point on we may treat the lease as ended.

In the meantime three of plaintiff's wells were destroyed and four more were disconnected. Mrs. Fisher must share in the blame of this because D'Ambrosia destroyed the wells under her direction and at a time she had not indicated in an unequivocal way that the

lease was over and he was bound to remove his property.

Should the Steel Corporation share in the blame on the ground that their direction to plaintiff and to Mrs. Fisher to remove the wells which precipitated the matter? The original contract between the Limestone Company and the Bairds which allowed the drilling of oil wells on the premises leased for limestone put the responsibility for removing the wells squarely up to the Bairds. The duties assumed by Bairds passed to Mrs. Fisher with ownership of the lands. A duty such as the Bairds' duty, and her duty to remove the wells upon demand by the Limestone Company is not released by mere assignment: ALI Restatement of the Law of Contracts §160 (4) ; Parish Mfg. Corp. v. Martin-Parry Corp., 285 Pa. 131. Equity views the contract as running with the lands: Finley v. Glenn et ux. 303 Pa. 131. When, therefore, the Steel Corporation as assignee of the Limestone Company directed the removal of the wells the impact fell upon Mrs. Fisher for she was the one to be charged if Moritz failed to remove them and the Steel Corporation had to do it.

The suggestion of her counsel as to the form of the notice to be given seems to be more consonant with the terms of the contract than the one which had been sent but no attention was paid to the suggestion. The Steel Corporation is the one which changed its mind. Having given the directions which it was entitled to give and then having had a change of heart, the Steel Corporation gave no one any notice of the change. Apparently neither Mrs. Fisher nor Moritz knew of the change until trial.

Up to this point I would decide that the Steel Corporation is responsible with Mrs. Fisher. However, the evidence does not establish that it was the com-

mand of the Steel Corporation which caused Mrs. Fisher to direct the pulling of the wells. Instead the letter written by Mrs. Fisher's counsel contained a sentence which indicated that she would do nothing until she heard further from the Steel Corporation. Apparently she changed her mind also and gave no notice of the change. In these circumstances Mrs. Fisher must bear the loss.

My finding that Hedegore was unable to secure a new agreement from Mrs. Fisher renders discussion of the propriety of admitting evidence on the point unnecessary. In passing upon her conduct up to the time she terminated the contract, it is well to remember that it was impossible for her to learn the true performance of the wells. Hedegore, and later plaintiff, mingled not only all the oil from the Fisher lease but oil from other leases. It was thus in their power to keep her in the dark regarding the production of any well.

The measure of damages is very simple, once the main question is decided. The lease having been terminated, plaintiff was obliged to plug the wells and was entitled to remove his property within three months. By destroying three of the wells and damaging casing, tubing and the like, defendants deprived him of the value of the personal property. Three hundred dollars per well is ample under the evidence. There may have been some damage to the wells which were merely uncoupled but the actual plugging of three wells by D'Ambrosia, a service which plaintiff was obliged to render, more than offsets this item.

Plaintiff may remove all his material from the lease within three months. He was in the junk business and apparently bought into the lease with this in mind. He protected himself in his dealings with Hedegore by a clause releasing him from payment if the lease was terminated. As to the interval during which he has

operated the wells he is directed to account for the production of oil up to the date of the decree and to pay Mrs. Fisher her royalty therefor. He overestimated his production but the amount of the production up to March 23, 1953, will be taken as established by his reports and royalty checks.

Mrs. Fisher's action in asserting as a counter-claim in the action in equity the same contentions advanced in the ejectment case is of no moment. Her demand was the same in each case and a party may bring as many consistent actions as he likes: Harper et ux. v. Quinlan, 159 Pa. Superior Ct. 367, 371; Patterson v. Swan, 9 S. & R. 16.

The use of the term "rent" instead of "royalty" does not affect the conclusion that the lease was susceptible of termination after the 20-year term of production fell below the minimum. The two terms are often used interchangeably in mineral leases. The general plan of the lease is clearly discernible.

### Conclusions of Law

1. After the end of the fixed term of 20 years fixed by the oil lease the lessee was only a tenant at will and the lease was terminable by either party upon a showing that the wells were not producing the minimum amount.

2. The action of the lessor in announcing that the lease was terminated and in bringing ejectment did not operate to terminate the lease because thereafter she continued to accept royalties and to make use of the gas from the lease.

3. The failure of the lessor to cash the last 23 royalty checks did not operate to terminate the lease because she never took an unequivocal stand and declared the lease ended and because she did not make clear her claim to be receiving the checks conditionally.

4. Mrs. Fisher's attempt in the court of equity to terminate the lease together with her tender of the royalty checks which had not been cashed was unequivocal conduct sufficient to terminate the lease.

5. The conduct of the Steel Corporation in giving notice to remove the wells and then altering its decision without notice does not operate to render it liable for the destruction of the wells while the lease was still in force, in the absence of evidence that the wells were removed in obedience to its command.

### Decree Nisi

Now this July 25, 1955, after hearing this case and giving it full consideration it is ordered, adjudged and decreed as follows:

1. The oil lease given by John S. Baird and wife to William Hedegore dated July 28, 1930, and described in the 4th finding of fact is hereby declared terminated and ended. The present lessee, Daniel A. Moritz, plaintiff in this action, is directed to remove his property and improvements within three months from this date as provided by the contract.

2. Defendant, Flora E. Fisher, is directed to pay to plaintiff the sum of $900 in payment of plaintiff's loss on the three wells which were plugged by Carmen D'Ambrosia at the direction of said defendant.

3. Settlement shall be made between plaintiff and Flora E. Fisher by plaintiff's rendering to Mrs. Fisher an account of the oil produced since March 23, 1953, to the date of this decree. Defendant, Mrs. Fisher, may cash the checks given her for the royalty during the period from January 10, 1952 and March 23, 1953, or plaintiff shall pay her the total amount thereof.

4. The costs shall be paid by defendant, Flora E. Fisher.

This decree shall become absolute unless exceptions hereto are filed within 20 days from the date hereof.