PAN AMERICAN PETROLEUM CORPORA-
TION; Phillips Petroleum Company; Sin-
clair Oil & Gas Company; and Skelly Oil
Company, Appellants,

and

Edgar Paul Boyko, Attorney General for the
State of Alaska, Appellant-Intervenor,

v.

SHELL OIL COMPANY; Standard Oil Com-
pany of California; Western Operations,
Inc.; and Atlantic-Richfield Company, Ap-
pellees.

No. 918.

Supreme Court of Alaska.

May 12, 1969.

Robert C. Erwin and Richard O. Gantz, Anchorage, John W. Howard, Tulsa, Okl., Paul F. Robison, Anchorage, for appellants.

G. Kent Edwards, Atty. Gen., Juneau, Edgar Paul Boyko, Former Atty. Gen., Robert L. Hartig, Asst. Atty. Gen., Anchorage, for appellant-intervenor.

Joseph Rudd, Eugene F. Wiles, Anchorage, Leslie E. Kell, Los Angeles, Cal., for appellees.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

RABINOWITZ, Justice.

In this appeal appellants and appellant-intervenor State of Alaska appeal from the superior court's judgment of September 19, 1967. This judgment reversed the determination of the Director of the Division of Lands, dated June 10, 1965, which decision had certified that Pan American Petroleum Corporation was entitled to pay a reduced royalty rate of 5 per cent, instead of the usual 12½ per cent, on all oil or gas production under Pan Am's lease in question.[1] Before reaching the first-impression questions which have been raised concerning Alaska's statutory royalty reduction allowance to "the holder of a lease who drills and makes the first discovery of oil or gas in commercial quantities in a geologic structure," we find it necessary to determine two threshold procedural issues. In order to place these latter issues in their proper context, a brief résumé of the history in this litigation is appropriate at this point.

On November 12, 1962, Pan Am filed an application for a discovery royalty certification with the Division of Lands of the State of Alaska. This application was based on a well which Pan Am drilled, Pan American Middle Ground Shoal No. 1. The well was drilled on a geologic structure known as the Middle Ground Shoal Structure, which in turn is located on the bottom of Cook Inlet, some 65 miles southwest of the city of Anchorage.[2] Pan Am's application for an award of a discovery royalty was granted on January 10, 1963. On November 16, 1963, Shell Oil applied to the Division of Lands for a discovery royalty certification. This application was based on a well which Shell Oil had drilled

on land immediately adjacent to and south of Pan Am's lease on the Middle Ground Shoal Structure. Shell Oil's application was thereafter denied by the Director of the Division of Lands on the basis that the well was located on the same geologic structure as Pan Am's Middle Ground Shoal No. 1.[3]

After being denied a royalty certification, Shell Oil filed an accusation under Alaska's Administrative Procedure Act.[4] A hearing was subsequently held before the Director of the Division of Lands and a hearing officer appointed pursuant to our Administrative Procedure Act. On June 10, 1965, the Director of the Division of Lands for the Department of Natural Resources, State of Alaska, held that:

The certification dated January 10, 1963, certifying that the respondents first discovered gas in commercial quantities in the Middleground Shoal Geologic Structure is affirmed and the award to the respondents on State Oil and Gas Lease ADL 17595 of the five per cent discovery royalty on all production of oil and/or gas for a period of ten years commencing on June 10, 1962, is hereby affirmed.

On August 9, 1965, Shell Oil filed a notice of appeal in the superior court from the June 10, 1965, adverse decision of the Director of the Division of Lands. Pan Am then moved to dismiss the appeal as untimely and in so doing argued that the Administrative Procedure Act was not applicable in regard to appeals from decisions of the Director of the Division of Lands. Pan Am's motion to dismiss was denied by the superior court on March 17, 1965.[5]

---

1. All appellants, with the exception of the intervenor, will be referred to hereinafter as Pan Am. Appellees will be referred to as Shell Oil.

2. Pan Am's Middle Ground Shoal No. 1 was drilled within the boundaries of State Oil and Gas Lease ADL 17595 which lease had been awarded to Pan Am after competitive bidding.

3. In his decision of December 19, 1963, the director relied on § 505.745(a) of the Alaska Oil and Gas Leasing Regulations found in 11 Alaska Adm.Code, div. 1, ch. 5(1).

4. AS 44.62.010–650.

5. On March 28, 1966, Pan Am petitioned this court for review of the superior court's denial of its motion to dismiss Shell Oil's appeal. Review was denied by this court on May 27, 1966.

Subsequently, Shell Oil moved for and was granted summary judgment. In its "Judgment on Appeal," the superior court ruled that:

> The Decision of the Division of Lands, Department of Natural Resources, dated June 10, 1965 granting Appellees on State Oil Lease ADL 17595 a five percent royalty on all production of oil and/or gas for a period of ten years commencing June 10, 1962 is set aside and the application of the Appellees for such discovery royalty is denied.

After the superior court had handed down its September 19, 1967, "Judgment on Appeal," the State of Alaska, pursuant to Civil Rule 24, sought leave to intervene or file an amicus curiae brief.[6] After intervention was granted, both Pan Am and appellant-intervenor State of Alaska appealed to this court from the superior court's judgment. On the basis of the foregoing, Pan Am has presented two questions which we have characterized as threshold precedural issues. Presented for resolution is the correctness of the superior court's ruling that Shell Oil's appeal from the June 10, 1965, decision of the Director of the Division of Lands was timely. Also raised is the correctness of the superior court's determination that neither the State of Alaska nor the Director of the Division of Lands were indispensable parties to the appeal.

■ Turning first to the question of the timeliness of Shell Oil's appeal to the superior court, we are of the view that the appeal was timely. In regard to the attainment of judicial review, AS 44.62.560

(a) of our Administrative Procedure Act provides that:

> Judicial review by the superior court of a final administrative order may be had by filing a notice of appeal in accordance with the applicable rules of court governing appeals in civil matters. * * * [T]he notice of appeal shall be filed within 30 days after the last day on which reconsideration can be ordered, and served on each party to the proceeding. .

Concerning the power of the agency to reconsider a particular case, it is provided in AS 44.62.540(a) that:

> The agency may order a reconsideration of all or part of the case on its own motion or on petition of a party. The power to order a reconsideration expires 30 days after the delivery or mailing of a decision to the respondent.[7]

In light of these provisions of the Administrative Procedure Act, we hold that Shell Oil's August 9, 1965, appeal from the June 10, 1965, decision of the Director of the Division of Lands was timely. Under this act, Shell Oil had 30 days after the last day in which reconsideration could be ordered to appeal and pursuant to AS 44.62.540(a), the agency had 30 days after June 10, 1965, in which to order a reconsideration of the case.

In reaching this conclusion we reject Pan Am's contention that controlling here are the regulations which were promulgated by the Commissioner of Natural Resources. Under these regulations, reconsideration of any Division of Lands' decision with respect to discovery royalties is precluded. Pan Am's argument here is based on AS

---

6. A second ground for Pan Am's motion to dismiss Shell Oil's appeal to the superior court was the asserted failure on Shell Oil's part to join either the State of Alaska or the Director of the Division of Lands who were indispensable parties. The superior court denied Pan Am's motion to dismiss on this ground.

7. As to the effective date of a decision, AS 44.62.520(a) reads as follows:

> A decision becomes effective 30 days after it is delivered or mailed to the respondent unless (1) a reconsideration is ordered within that time, (2) the agency itself orders that the decision become effective sooner, or (3) a stay of execution is granted for a particular purpose and not to postpone judicial review.

44.62.330(a) of the Administrative Procedure Act. which provides in part that:

> This procedure, including, but not limited to * * * judicial review and scope of judicial review * * * shall be governed by this chapter, notwithstanding similar provisions in the statutes dealing with the state boards, commissions, and officers listed. Where indicated, the procedure that shall be conducted under §§ 330–630 of this chapter is limited to named functions of the agency.
>
>     *     *     *     *     *     *
>
> (9) Division of Lands under Alaska Land Act where applicable * * *.

Pan Am argues that the "where applicable" portion of AS 44.62.330(a) must be read in conjunction with the Alaska Land Act which authorized the Commissioner of Natural Resources to "establish reasonable procedures and adopt reasonable rules and regulations necessary to carry out" the purpose of the act.[8] Acting pursuant to this authority, the commissioner promulgated regulations which embodied the types of orders or decisions which were subject to reconsideration by the director or the commissioner.[9] From the foregoing, Pan Am further argues that, "Orders or decisions with respect to discovery royalty are not among those listed and hence under the rule of *expressio unius est exclusio alterius* are not subject to reconsideration."

We disagree with Pan Am's contentions on several grounds. First, we believe that appellants' argument overlooks that portion of AS 44.62.330(a) of the Administrative Procedure Act which, in regard to the procedure governing judicial review provides that the act shall govern judicial review of decisions of the Division of Lands "notwithstanding similar provisions" in the Alaska Land Act. Adoption of Pan Am's position here would frustrate the policy, manifested in the text of AS 44.62.330(a) of the Administrative Procedure Act, to establish uniform procedures for the governance of the adjudicatory functions of our administrative agencies.[10] Additionally, on the particular facts of this record, we believe that the superior court properly denied Pan Am's motion to dismiss. At two separate stages of the litigation before the Division of Lands, the adjudicative portions of the Administrative Procedure Act were held to be applicable to awards-of-discovery-royalty proceedings. In denying Pan Am's motion to dismiss, the trial court stated in part:

> [A]nd another consideration here is that this matter was heard initially before the Division of Lands and it was made apparent and clear to all parties that it was being heard under the Administrative Procedure Act and there was no serious objection taken to it. At this time the Court feels it would be unreasonable for the parties now to be allowed to take the position that it was not held under that [act].

Finally, we believe the reasoning employed in Aleutian Homes v. Fischer [11] is of relevance to the case at bar. The *Aleutian Homes* case presented the factor of uncertainty as to whether the review provisions of the Alaska Workmen's Compensation Act or those of the Administrative Procedure Act controlled. There we indicated that we will consider an appeal to the superior court timely although not filed in accordance with the proper construction of the controlling statute. This is not to say that in this case we find any uncertainty in the pertinent review provisions of the Administrative Procedure Act. All we indicate here is that since this question was apparently one of first impression, the trial court could have adopted a technique similar to that which was employed in the *Aleutian Homes* case in order to reach the merits of the appeal in question.

---

8. AS 38.05.020(b) (1).

9. *See* §§ 516.31 and 516.32 of the Oil and Gas Leasing Regulations.

10. *Compare* unpublished letter opinion from the Attorney General to the Department of Natural Resources, October 1, 1963.

11. 418 P.2d 769, 773 (Alaska 1966).

Pan Am and appellant-intervenor State of Alaska urge as a second threshold issue the alleged error of the superior court in refusing to dismiss Shell Oil's appeal for failure to join an "indispensable party," assertedly the State of Alaska or the Director of the Division of Lands. Pan Am argues that Shell Oil's dispute was in reality with the Division of Lands and not with Pan Am. The State of Alaska contends that it had a direct interest in the litigation

since the reversal of the administrative determination affects the respective royalty obligations of the State as well as of the parties to this action. This is so since the State will, as a result of the judgment entered by the Superior Court, probably become obligated to make repayment of royalties to .Appellees and become obligated to compel additional payment from Appellants.

Appellant-intervenor State of Alaska also argues that it had an equally significant interest in the outcome of this litigation, the nature of such interest being in

establishing, developing, advancing and protecting the integrity of its administrative decisions, the difference [sic] to be accorded in interpretations properly given by officials legally entrusted therewith, and the finality of administrative determinations.

According to Pan Am and the State of Alaska, the superior court's failure to dismiss the appeal erroneously ignored the requirement of Civil Rule 19(a) to the effect that persons having joint interest in an action shall be joined in such action.[12] This court has had occasion to construe Civil Rule 19(a) in the following decisions: Hardy v. Island Homes, Inc.;[13] Nordin v. Zimmer;[14] State, Dep't of Highways v. Crosby;[15] City of Fairbanks v. Electric Distribution System;[16] and Alyeska Ski Corporation v. Holdsworth.[17] In regard to determination of whether a party is "indispensable" to the litigation, we have held that in resolving such questions the trial court is vested with discretion and that exercise of this discretion necessarily involves a balancing test. In Alyeska Ski Corporation v. Holdsworth [18] we followed our previous decision in *Crosby* [19] where it was said:

The determination of indispensability or lack of it involves a discretionary balancing of interests. On the one hand, consideration must be given to the possibility of rendering a judgment that will have an adverse factual effect on the interests of persons not before the court, and to the danger of inconsistent decisions, the desire to avoid a multiplicity of actions, and a reluctance to enter a judgment that will not end the litigation. On the other hand, consideration must be given to the desirability of having some adjudication if at all possible rather than none, leaving the parties before the court without a remedy because of an 'ideal desire to have all interested persons before the court.' Courts exist for the determination of disputes, and they have an obligation in particular litigation to make meaningful determinations if at all possible.

Assuming that appellant-intervenor State of Alaska could be properly classed as a necessary party under Civil Rule 19(a), we believe that upon consideration of the criteria adopted in *Crosby* the superior court could have reasonably concluded that nei-

12. Pan Am concedes that the Administrative Procedure Act does not expressly provide that the agency be made a party to any challenge to its determinations, but they argue that "that inference may be fairly drawn from AS 44.62.560 which states that it 'is the final administrative order' that is to be reviewed by the Court."

13. 363 P.2d 637, 643 (Alaska 1961).

14. 373 P.2d 738, 742 (Alaska 1962).

15. 410 P.2d 724, 725–726 (Alaska 1966).

16. 413 P.2d 165, 166–167 (Alaska 1966).

17. 426 P.2d 1006, 1016–1017 (Alaska 1967).

18. *Id.*

19. 410 P.2d 724, 725–726 (Alaska 1966) (footnotes omitted).

ther the Director of the Division of Lands nor the State of Alaska were indispensable parties to the appellate proceedings which were had in the superior court.

We agree with Shell Oil's contention that even if it be assumed that Civil Rule 19 is applicable, the State of Alaska could not properly be classed as an indispensable party because it did not, and could not, have any interest in the subject matter of the litigation, namely, the 7½ per cent royalty differential.[20] Except for foreseeable temporary disruptions of administrative routine, we cannot discern how the state's non-participation in the appeal to the superior court could adversely affect it.[21] Additionally, we believe that the trial court was justified in denying Pan Am's motion to dismiss upon consideration of the nature of the proceeding which was pending before it. Of particular significance to resolution of this question is the fact that neither the State of Alaska nor the Director of the Division of Lands was a party to the administrative royalty award contest proceedings. Once superior court review was sought of the director's June 10, 1965, decision, the judicial review provisions of the Administrative Procedure Act became controlling. It is at this point that we disagree with Pan Am's position for, as we have noted, Pan Am argues that AS 44.62.-560 of the Administrative Procedure Act provides for judicial review "of a final administrative order." Given the factual setting of this record, we consider it too broad a reading of AS 44.62.560 to conclude

that the phraseology "final administrative order" manifests a legislative intent that the Director of the Division of Lands, or the State of Alaska, are necessary parties to any appeal from the director's grant or rejection of an application for royalty allowance once the same has been contested.[22] We therefore uphold the superior court's refusal to dismiss Shell Oil's appeal on the grounds that Shell had failed to join an indispensable party.

█ We now turn to what has been characterized as the focal point of this litigation, namely, the correct statutory construction of section 180(a) of the Alaska Land Act. As was noted before, this section provides in part that:

> [T]he holder of a lease who drills and makes the first discovery of oil or gas in commercial quantities in a geologic structure shall pay a royalty on all production under the lease of five per cent for 10 years following the date of discovery and thereafter the royalty rate shall be not less than 12½ per cent * * *.[23]

The applicable administrative regulation in effect at the time of the award of the discovery royalty to Pan Am reads in part as follows:

> If any holder of a lease shall drill under said lease and make the first discovery of oil or gas in commercial quantities in any geologic structure the royalty rate on all production under the lease shall be 5 per cent for 10 years following the date of such discovery and thereafter

20. In its brief Shell Oil states that the State
 is under a statutory mandate and contractual duty (under the oil and gas lease) *to grant* it to the party who makes the 'first discovery of oil or gas in commercial quantities.'

21. Nor will either Shell Oil or Pan Am be exposed to a later recovery by the state. *See* Comment of the Advisory Committee on The Federal Rules of Civil Procedure, Civ.R. 19, in 3A J. Moore, Federal Practice ¶ 19.01 [5.–1], at 2109–2110 (2d ed. 1968).

In our view any interest the state may have in the shaping of administrative law has been adequately protected once it was granted permission to intervene.

22. *Compare* Spring v. Ohio Oil Co., 108 F.2d 560 (5th Cir. 1940); State ex rel. Bringhurst v. Zoning Bd. of Appeal and Adjustment, 198 La. 758, 4 So.2d 820, 821–822 (1941); Miles v. McKinney, 174 Md. 551, 199 A. 540, 117 A.L.R. 207 (1938); Town of Eagan, Dakota County v. Minnesota Municipal Comm'n, 269 Minn. 239, 130 N.W.2d 525, 526 (1964).

23. AS 38.05.180(a).

the royalty rate shall be fixed in the lease.[24]

In regard to AS 38.05.180(a) and section 505.74 of the regulations, the paramount issue in this appeal centers on the phrase "in commercial quantities." For it is not disputed that Pan Am satisfied the remaining requirements of AS 38.05.180(a) and the substantially identical provisions of regulation 505.74.

Review of the record discloses Pan Am was a "holder of a lease" having been, on February 1, 1962, the successful bidder for a competitive oil and gas lease (Lease No. ADL 17595) which encompassed the ground in question.[25] The record further discloses that there is no dispute as to the fact that Pan Am's discovery well was drilled on a separate "geologic structure." In his decision of June 10, 1965, the Director of the Division of Lands stated in part that, "The award of the discovery royalty to respondents [Pan Am] was not contested as to time nor as to the geological structure on which the respondents Middleground Shoal No. 1 Well is located." The record shows that the Middle Ground Shoal Geologic Structure is a domal anticline 15 miles long, approximately 3 miles wide with several thousand feet of closure in all directions.[26]

In his decision of June 10, 1965, the Director of the Division of Lands found that Pan Am "discovered gas on June 10, 1965, in their Middleground Shoal Well No. 1 * * * covered by State of Alaska Oil and Gas Lease ADL 17595 and I further find that this discovery was the first discovery of gas and/or oil on the Middleground Shoal geologic structure." [27] The undisputed evidence shows that on May 15, 1962, Pan Am spudded its Middle Ground Shoal No. 1 well. Hydrocarbons were first encountered in conjunction with a blowout which occurred on May 22, 1962, at a time when Pan Am's No. 1 well had been drilled to a depth of 1,132 feet. Drilling was continued and on June 10, 1962, Pan Am's No. 1 well had been drilled to a depth of 5,216 feet. At this depth the well blew out and gas began bubbling in Cook Inlet near the well on the morning of June 11, 1962. In his decision the director found that:

On June 12th the well erupted into the Inlet approximately 750 feet from the drilling platform. The well was finally brought under control on July 26, 1962. Prior to that date samples of gas were taken and temperature surveys were also run.

In his decision of June 10, 1965, the director further found that the gas which was discovered by Pan Am in their Middle Ground Shoal Well No. 1 was "of sufficient quality and quantity to be marketable both for thermal and other use." [28] There

---

24. 11 Alaska Adm.Code § 505.74 (1963). The current regulations governing discovery royalties are found in §§ 505.74, 505.741 through 505.745. These regulations are attached hereto in the appendix.

25. Paragraph 12 of the competitive oil and gas lease which was issued to Pan Am reads as follows:
     Reduction of Royalty Rates for Discovery. If Lessee shall drill on said land and make the first discovery of oil or gas in commercial quantities in any geological structure, the royalty rate under this lease shall, instead of the rates prescribed in paragraph 11, be five percent for a period of ten years following the date of such discovery.

26. As one witness defined the term, a domal anticline is a feature expressed in layers of rocks where you have inclination in two directions away from the core and then from the core of the anticline and along the axis you have plunge—that is, the structure falls away from a central point. This is depicted in the contours. Pan Am's Anchorage exploration supervisor, at the time characterized the Middle Ground Shoal Geologic Structure as one of the largest seen in recent years containing "lots of seismic closure."

27. We have previously alluded to the fact that the director found the royalty award to Pan Am was not contested as to the time or as to the geologic structure.

28. The director also found that:
     The quality of the gas was established by gas analysis set forth in plaintiffs'

is no dispute concerning the quality of the gas which was discovered in the Middle Ground Shoal Well No. 1.

Our review of the record leads us to the conclusion that it was clearly established, and the Director of the Division of Lands properly found, that Pan Am was "the holder of a lease" who "drilled" and made the "first discovery" of "gas" in a "geologic structure." Thus, the only statutory and regulatory prerequisite remaining to an award of the discovery royalty differential is the one criterion that the discovered gas must be in "commercial quantities." [29]

Concerning this last issue, the Director of the Division of Lands made the following findings:

[Shell Oil] and some of the witnesses contended that the gas that was discovered may have emanated from a small pocket which was being quickly depleted. I find the evidence to the contrary. The pressure readings taken by [Pan Am] after the blow out were the only objective tests available. [Pan Am] conceded that the tests were not conducted under ideal conditions nor did they employ all of the testing equipment that would have been desirable. Nevertheless, evidence was presented showing sustained pressure readings of 500 pounds to 800 pounds per square inch. [Pan Am] submitted evidence supporting an open flow rate of 28 to 30 million cubic feet per day. These calculations were subject to considerable criticism, some merited. Viewing the evidence as a

whole, however, including the expressed opinions, I conclude that there was established sufficient reservoir pressure and volume to indicate reserves in adequate quantity to be marketable commercially.

I further find that the gas discovered on ADL 17595 is commercially valuable. Even the expressed opinions based on maximum cost factors and minimum reserve estimates indicate commercial marketability. In addition to sale for consumption, the gas could well be used for re-pressuring the Middleground Shoal or other fields.

In his conclusions of law the director held that:

The gas that was discovered was in commercial quantities. There was sufficient reservoir pressure and volume to indicate reserves of an adequate quantity to justify marketing.

The superior court determined, when the director's decision was appealed to it, that the director should have followed certain specific criteria in deciding whether or not a discovery royalty award was warranted. In its decision the superior court conceived the following criteria to be controlling:

[The director] should have (1) required a completed well capable of production; (2) required sustained production tests; and (3) refrained from making the discovery award until the well was actually placed in commercial production.[30]

The superior court then reviewed the record against these three criteria and con-

---

exhibits No. 8 and No. 9. Exhibit No. 8 contains a gas analysis from a sample collected on June 24, 1962. This sample reflects 952 BTU/Cu. Ft. containing 95.68% methane. Exhibit No. 9 is a gas analysis from a sample collected on June 27, 1962. This sample reflects 970 BTU/Cu. Ft. containing 97.26% methane.

29. At the pertinent times in question the term "commercial quantities" was not defined either by statute or regulation.

30. The superior court formulated these criteria on the basis of the following reasoning:

It is to be noted that the Regulation in effect under which Appellees were granted the discovery royalty essentially paraphrased the Statute under which the discovery royalty was granted. Therefore, it is impossible to determine the Agency's interpretation of the Statute from the purported Regulation promulgated by the Agency. The Court must, therefore, look elsewhere in attempting to construe the criteria intended by the Legislature at the time the Statute was enacted or the standards to be used by the Agency in administering the Act.

cluded that there was no evidence introduced that Pan Am's discovery well was a completed well capable of production. The court also held that Pan Am had not concluded any tests for the purpose of determining production. Additionally, the superior court concluded that no commercial production was shown "since sufficient reserve data was not available or submitted by [Pan Am] so that reserves could be computed." Based on these holdings, the superior court set aside the director's decision of June 10, 1965, and denied Pan Am's application for a discovery royalty award.

Consideration of all the arguments which have been advanced by the parties to this appeal, together with our study of the record, has led us to the conclusion that the director's June 10, 1965, decision is supported by substantial evidence; that his decision reflects a reasonable construction of the term "commercial quantities"; and that the superior court's judgment should be reversed.

Briefly, the evidence in regard to this last remaining statutory prerequisite to the allowance of a discovery royalty discloses the following: After Pan Am's Middle Ground Shoal No. 1 well blew out on June 10, 1962, gas flowed from the well into Cook Inlet for a period of 45 days before the well was successfully plugged and subsequently abandoned.[31] During this 45-day period in which remedial action was undertaken by Pan Am to kill the well, pressure and temperature readings were obtained.[32] Working in part from this data, Pan Am's witness Grekel calculated a total flow rate of 28.3 million standard cubic feet per day on the basis of 300 pounds pressure. At 600 pounds pressure, this same witness estimated that 56.6 million standard cubic feet of dry gas would flow per day.[33] Additionally, testimony was produced as to the total amount of gas reserves in relation to the Middle Ground Shoal No. 1 well.[34] Pan Am also adduced evidence that the gas was a merchantable quality and had potential market use for repressuring of oil reservoirs located in the Middle Ground Shoal and for use in artificial lift procedures to maintain high flow rates of oil at Middle Ground Shoal.[35]

In reaching our conclusion that the director's decision is supported by substantial evidence and reflects a reasonable construction of the term "commercial quantities," we disagree with Shell Oil's contention as to the applicable standard scope of review under section 570(c) of the Administrative Procedure Act. In regard to the scope of review, this section of our act provides that the superior court

may exercise its independent judgment on the evidence. If it is claimed that the findings are not supported by the evidence, abuse of discretion is established if the court determines that the findings

31. According to the testimony of one witness, the gas had blown out a tremendous crater in the Inlet, erupting tremendous volumes of gas and blowing water into the air.

32. Pan Am's witness Piper testified that he obtained readings of 800 pounds pressure on June 10, 1962, and 500 pounds pressure on June 13, 1962.

33. Pan Am also produced testimony to the effect that the gas was emanating from a zone below the depth of 2,500 feet.

34. Total reserves were estimated at 295 billion cubic feet. Testimony on this point was received as to the presence of productive sand layers in Pan Am's No. 1 well and also in Pan Am's No. 4 well which was located on the same geologic structure.

35. In this regard the director's decision reads:

I further find that the gas discovered on ADL 17595 is commercially valuable. Even the expressed opinions based on maximum cost factors and minimum reserve estimates indicate commercial marketability. In addition to sale for consumption, the gas could well be used for re-pressuring the Middleground Shoal or other fields.

Pan Am also presented evidence that sale of the gas from the Middle Ground Shoal, in light of indicated reserves, would represent a desirable investment opportunity.

are not supported by (1) the weight of the evidence, or (2) substantial evidence in the light of the whole record.

From the foregoing provisions of AS 44.62.570(c), Shell Oil argues that the superior court possesses broad review powers "including making an independent judgment on the facts and independent findings of fact and conclusions of law, and is not restricted in all cases to a limited review of the facts, i. e., the substantial evidence on the whole record test." [36] We reject this argument for the following reasons. In Keiner v. City of Anchorage,[37] we adopted the substantial evidence criterion as the appropriate scope of review in regard to appeals from administrative agencies to the superior court. We have subsequently adhered to the substantial evidence test in articulating the superior court's scope of review under the Administrative Procedure Act.[38] No decision of this court has as yet embraced the "independent judgment on the evidence" criterion. And, on the basis of the record in the case at bar and the arguments advanced in behalf of adoption of this criterion, we

are not persuaded to enter the judicial thicket which led to the codification of the "independent judgment" standard in the California act.[39] For in this jurisdiction the judicial predicate to implementation of the "independent judgment" criterion is lacking. More particularly, we have no precedent holding that Alaska's administrative agencies lack judicial or quasi-judicial authority.[40] In our opinion, adoption of the "independent judgment" standard could possibly result in dislocations of the respective functions of administrative agencies and the superior court.

Also inherent in our holding affirming the director's decision is our conclusion that to do so is not tantamount to judicial abdication or violation of the doctrine of separation of powers. For Shell Oil has contended that historically it is within the judiciary's sole province to construe statutes in order to determine the law or questions of law.[41] On the other hand, Pan Am advances the argument that the agency's interpretation of a statute should be upheld if the reviewing court can ascertain a reasonable basis for such an interpreta-

36. In support of this argument, Shell Oil points to the legislative history of our Administrative Procedure Act, the fact that it was patterned after California's act, and that under City of Fairbanks v. Schaible, 375 P.2d 201, 207–208 (Alaska 1962), it should be construed in accord with California interpretations. *Compare* Beckley v. State, 443 P.2d 51 (Alaska 1968).

37. 378 P.2d 406 (Alaska 1963).

38. Forth v. Northern Stevedoring & Handling Corp., 385 P.2d 944, 948 (Alaska 1963); Beylund v. Matanuska Valley Farmers Co-Op Ass'n, 391 P.2d 176, 177–178 (Alaska 1964); Alaska Alcoholic Beverage Control Bd. v. Malcolm, Inc., 391 P.2d 441, 446 (Alaska 1964); Fischback & Moore of Alaska, Inc. v. Lynn, 407 P.2d 174, 177 (Alaska 1965); Morrison-Knudsen Co. v. Vereen, 414 P.2d 536, 542 (Alaska 1966); Fischback & Moore of Alaska, Inc. v. Lynn, 453 P.2d 478 (Alaska 1969).

39. For an excellent treatment of this subject, see V. Netterville, Judicial Review: The 'Independent Judgment' Anomaly, 44 Cal.L.Rev. 262 (1956). In this article the origins and evolution of California's Administrative Procedure Act are discussed. In Standard Oil Co. of Cal. v. State Bd. of Equalization, 6 Cal.2d 557, 59 P.2d 119 (1936), it was held that certiorari was not available to review administrative determinations. It was reasoned that certiorari was available only to review judicial acts and that administrative agencies did not possess judicial powers. One year later in Whitten v. Cal. State Bd. of Optometry, 8 Cal.2d 444, 65 P.2d 1296, 115 A.L.R. 1 (1937), prohibition was likewise held to be available to obtain review of administrative determinations.

40. Note 39, *supra*. *See also* Chief Justice Traynor's dissent in Moran v. State Bd. of Medical Examiners, 32 Cal.2d 301, 196 P.2d 20, 31–32 (1948).

41. We believe that Shell Oil's reliance on Alyeska Ski Corp. v. Holdsworth, 426 P.2d 1006 (Alaska 1967), is inapposite here.

tion.[42] The Supreme Court of the United States has employed the "practical" or "reasonable basis" approach to judicial review of administrative decisions which may be termed as having embraced questions of law.[43] In Udall v. Tallman [44] the Supreme Court said:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' Unemployment Comm'n of Territory of Alaska v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136

[145], 11 Alaska 236. See also, e. g., Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; Universal Battery Co. v. United States, 281 U.S. 580, 583, 50 S.Ct. 422, 74 L.Ed. 1051 [1054].[45]

In our view the case at bar represents an appropriate occasion for employment of the "reasonable basis" approach to review of the Director of Natural Resources construction of the phrase "commercial quantities." We reach this conclusion in light of the policy considerations involved and the particularized complexity of the subject matter.[46] For we are not concerned with the wisdom of granting discovery royalties or with the development of restrictive or expansive criterion to implement any given policy pertaining to the awarding of discovery royalties.[47] We do not consider our decision in Aleutian

42. The issue has been viewed as one involving the comparative qualifications of courts and administrative agencies. *See* C. Peck, The Scope of Judicial Review of Administrative Action in Washington, 33 Wash.L.Rev. 55, 71 (1958); 4 K. Davis, Administrative Law § 30.02, at 197 (1958).

43. *See* Power Reactor Dev. Co. v. International Union of Electrical etc., Workers, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed. 2d 924, 932 (1961); NLRB v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170, 1184 (1944); Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796, 806 (1933).

44. 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616, 625 (1964), rehearing denied, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965).

45. *See* B. Schwartz, Gray v. Powell and The Scope of Review, 54 Mich.L.Rev. 1, 15 (1955); R. Stern, Review of Findings of Administrators, Judges and Juries: A Comparative Analysis, 58 Harv.L.Rev. 70, 106–07 (1944). *See also* the following authorities which have followed the Gray v. Powell reasonable basis test: United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971 (1942); Southern S.S. Co. v. NLRB, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942); Gregg Cartage & Storage Co. v. United States, 316 U.S. 74, 62 S.Ct. 932, 86 L.Ed. 283 (1942);

Dobson v. Commissioner of Internal Revenue, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248 (1943); Thomson v. United States, 321 U.S. 19, 64 S.Ct. 392, 88 L.Ed. 513 (1944); Eastern-Central Motor Carriers Ass'n v. United States, 321 U.S. 194, 64 S.Ct. 499, 88 L.Ed. 668 (1944); Equitable Life Assur. Soc. of United States v. Commissioner of Internal Revenue, 321 U.S. 560, 64 S.Ct. 722, 88 L.Ed. 927 (1944).

46. In S. E. C. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995, 2005–2006 (1947), the Supreme Court of the United States said:

The Commission's conclusion here rests squarely in that area where administrative judgments are entitled to the greatest amount of weight by appellate courts. It is the product of administrative experience, appreciation of the complexities of the problem, realization of the statutory policies, and responsible treatment of the uncontested facts. *It is the type of judgment which administrative agencies are best equipped to make and which justifies the use of the administrative process. * * * Whether we agree or disagree with the result reached, it is an allowable judgment which we cannot disturb.* (Emphasis added.)

47. The State of Alaska urges that this court not weaken the discovery concept of AS 38.05.180(a) by burdening it with conditions inimical to a strong policy encouraging development of the State's

Homes v. Fischer [48] or Northern Corporation v. Saari [49] as precluding adoption of the "reasonable basis" approach to judicial review.[50] Rather, we believe our decision in Whaley v. State [51] foreshadowed the approach of the "reasonable basis" standard of review in the case at bar. In Whaley we said:

*The rules that we have referred to are interpretive of the law in that they result in a construction of the words 'employee in the classified service,' within the meaning of the statute, as referring only to employees who have attained a permanent status in their employment with the state * * *. Such interpretative rules were made pursuant to statutory authority, and appellant does not point out, nor do we perceive, that those rules are unreasonable and not in accord with the terms and purposes of the statute pursuant to which they were adopted. We have no basis for not upholding such an administrative interpretation of AS*

*39.25.170, particularly in view of the well settled rule that requires courts to give consideration and respect to the contemporaneous construction of a statute by those charged with its administration, and not to overrule such construction except for weighty reasons.* (Emphasis added.)

As to Shell Oil's remaining arguments based on the director's letter of October 24, 1962,[52] the subsequent oil and gas regulations which became effective August 8, 1963,[53] and the Federal Mineral Leasing Act,[54] we find none of them determinative here. We note that Shell Oil has cited no applicable federal precedent or practice under the federal act or regulation which would support its pari materia argument. Our own research has disclosed no established criteria for determination of "discovery in commercial quantities." Shell Oil attempts to equate "production in paying quantities" with discovery in commercial quantities."[55] None of the authorities pre-

natural resources. Adoption of the restricting criteria suggested by the superior court would, the state submits, not be consistent with that policy.

48. 418 P.2d 769 (Alaska 1966).

49. 409 P.2d 845 (Alaska 1966).

50. Both of these decisions involved workmen's compensation questions where the terms "arising out of and in the course of employment," as well as "occupational disease" had well defined meanings.

51. 438 P.2d 718, 722 (Alaska 1968) (footnotes omitted).

52. This letter was sent by the director to the Chairman of the Western Oil and Gas Association. In his concluding paragraph, the director wrote:
We would appreciate it if you and the appropriate committee of your organization will review these proposed procedures and offer any suggestions or comments for our consideration.

53. The subsequent regulations are set forth in the appendix. Apparently these regulations have combined the prudent operator test with several of the more stringent standards suggested by Shell Oil. For instance, the new 505.74 regulation interjects the prudent operator standard and appears to merge the discovery concept with the distinct "production in paying quantities" criterion.

54. The Federal Mineral Leasing Act of February 25, 1920, 30 U.S.C. § 181 et seq. was repealed in 1958 but regulations thereunder were incorporated as 43 C.F.R. § 3125.3(a) (1) which reads:
Royalty on production.
(a) On and after August 8, 1946, the following royalty rates shall be paid on the production removed or sold from leases:
(1) 12½ percent royalty on noncompetitive leases issued under section 17 of the act: *Provided, however,* that any holder of a lease for lands in Alaska which issued and was outstanding prior to May 3, 1958, who shall drill and make the first discovery of oil or gas in commercial quantities in any geologic structure shall pay a royalty on all production under the lease of 5 percent for 10 years following the date of such discovery and thereafter the royalty rate shall be 12½ percent.

55. *See* 2 W. Summers, Oil and Gas § 306 (1959), where the author states that the phrase "discovery in paying quantities" appears in oil and gas leases. When used in a covenant to drill additional wells, Summers states:
The term paying quantities as used in this connection means such quantities as would yield to the lessee a reasonable profit after deducting the cost of drill-

sented has persuaded us that the two terms are equatable. It appears that our legislature has distinguished between the two concepts. AS 38.05.180(a) employs the phrase "discovery in commercial quantities" twice in the first two paragraphs. Further along in the same subsection, however, the following appears:

> Competitive leases issued under this subsection shall be for 10 years and shall continue so long thereafter as oil or gas is produced in paying quantities.

It is then provided that if drilling is begun on the expiration date of the lease and continued with reasonable diligence, the

> lease shall continue in effect until 90 days after drilling has ceased and for so long thereafter as oil or gas is produced in paying quantities.

"Paying quantities" terminology also appears in subsections (b), (c), (e), and (r) of the same section.[56]

From the foregoing, we cannot conclude that the director's award of a royalty differential to Pan Am was erroneous for there was substantial evidence in the record to support it. Nor are we convinced that there was no reasonable basis for

the director's construction of the term "commercial quantities" on the facts of this record.

The judgment of the superior court is reversed and vacated and the matter remanded to the superior court with directions to reinstate the June 10, 1965, decision of the Director of the Division of Lands.

## APPENDIX

The current administrative regulations governing discovery royalties are found in Title 11, Sections 505.74 and 505.741 through 505.745, Alaska Administrative Code. These regulations read as follows:

> *505.74 Discovery Lease.* Any operator who by time and date first encounters sufficient evidence of oil and/or gas in a particular geologic structure covered by any State oil and gas lease to cause said operator diligently to continue in good faith testing, reworking, drilling or other operations on said lease, whether in the same hole or other holes, in an effort to establish production of oil and/or gas in the same structure shall be qualified for a discovery well certification under

---

ing, equipping and operating the well or wells.

Speaking of the use of "production in paying quantities" in the habendum clause, Summers writes at 338–341:

This definition of the term paying quantities is different from the definition of that term when used in connection with the express or implied covenants of the lessee to drill additional or offset wells in that here the cost of drilling and equipment of the wells is excluded in calculation of the profit to the lessee.

We further note that Kinard v. Shackleford, 209 Ark. 244, 190 S.W.2d 12, 13 (1945), relied upon by Shell did not involve a discovery situation. There the mortgage contemplated an actual profitable oil well.

All of Pan Am's other citations are examples of judicial constructions of the familiar "production in paying quantities" test and involve interpretations of this expression as found in either the habendum clause or in the covenant to drill additional wells clause of oil and gas

leases. See, e. g., Benedum-Trees Oil Co. v. Davis, 107 F.2d 981, 985–986 (6th Cir. 1939); Union Gas & Oil Co. v. Adkins, 278 F. 854, 856 (6th Cir. 1922); Smith v. Sun Oil Co., 172 La. 655, 135 So. 15 (1931); Murdock-West Co. v. Logan, 69 Ohio St. 514, 69 N.E. 984 (1904); Walden v. Potts, 194 Okl. 453, 152 P.2d 923 (1944); Gulf Oil Corp. v. Reid, 161 Tex. 51, 337 S.W.2d 267 (1960); Clifton v. Koontz, 160 Tex. 82, 325 S.W.2d 684, 79 A.L.R.2d 774 (1959); Hanks v. Magnolia Petroleum Co., 24 S.W.2d 5 (Comm.App.Tex. 1930).

56. The 1957 Alaska Land Act was worded so as to award a "royalty of not less than five percentum (5%) for the first ten years [to the] *first producer in a new area.*" SLA 1957, ch. 184, art. IX, § 2 (b). Subsequently, the "producer" standard was abandoned in the present law in favor of awarding the royalty reduction to the operator making the first "discovery * * * in commercial quantities."

the terms of said State lease should he complete a well and establish production in commercial quantities in the same zone in which oil and/or gas was first encountered.

*505.741 Definitions.* With regard to Sections 505.74 through 505.748 and applicable provisions in State leases, the following terms shall have the meanings indicated.

(a) 'Discovery' shall be the first acceptable evidence in a drilling well of the existence of oil and/or gas which can be produced in commercial quantities after well completion;

(b) 'Geologic structure' shall be any structural and/or stratigraphic entrapping mechanism containing one or more intervals, zones, strata, formations, or fault blocks which has the necessary physical characteristics to accumulate and prevent the escape of oil and/or gas. It is intended that the meaning shall be similar to that as used by the United States Geological Survey in the administration of the Federal Mineral Leasing Act of February 25, 1920 (41 Stat. 437) as amended;

(c) 'Completed Well' shall be a well which is cased, controlled and in which all underground work in connection therewith has been finished and such well is capable of producing oil and/or gas;

(d) 'Commercial Quantities' shall be those amounts of oil and/or gas which after well completion would appear to a reasonable and prudent operator to be sufficient to recover ordinary costs of drilling, completing and producing an additional well on the same geologic structure at an offset location with a reasonable profit to the operator, if a market were available;

(e) 'Committee' shall be the Alaska Oil and Gas Conservation Committee composed of the Director of Mines and Minerals (Chairman), the State Petroleum Geologist, the State Petroleum Engineer and the Deputy Commissioner of the Department of Natural Resources or his designee.

*505.742 Establishment of Priority as to Time and Date.* To establish priority as to time and date of discovery, an operator must furnish the Committee with a sworn statement substantiating evidence, acceptable to the Committee, that oil and/or gas has been encountered in sufficient showing to cause a reasonable and prudent operator to conduct further operations in an effort to complete a well in the discovery zone so that such well can be tested for potential oil and/or gas production in commercial quantities. Such statement must include the time and date of first discovery, the exact location of the well concerned, the precise interval of discovery and the Alaska Division of Lands lease number on which said well is located. Such statements should be furnished to the Committee as soon as possible, but not later that 30 days after the date claimed for the discovery.

*505.743 Establishment of Commercial Quantities.* To establish and prove oil and/or gas in commercial quantities, operator must:

(a) Conduct a potential test of the discovery zone within one year after completion of a discovery well;

(b) Notify the Committee or its designated representative five days in advance of such scheduled potential test and furnish transportation (if requested) for a designated representative of the Committee to witness such test. The Committee may at its option or at the option of its designated representative waive the witnessing of the test and require sworn evidence to establish results of said test. Any such sworn evidence shall be delivered to the Committee or its designated representative within 30 days after such test.

*505.744 Establishment of Geologic Structure.* To establish the geologic structure from which the oil and/or gas can be produced, the operator must furnish pertinent data to the Committee

which will enable it to determine the geologic structure from which the oil and/or gas is being produced. This may include but is not limited to: geophysical data, total depth, casing records, perforation data, electric logs, drilling and mud logs, core analyses, sample cuttings and sample logs and the operator's interpretation thereof, together with any other records and interpretations the operator deems pertinent. This data must be supplied within 90 days after the date of the potential test as required in Section 505.743. All such data submitted shall be held confidential for a period of 24 months unless written authorization from the operator for the release of same is secured.

*505.745 Certification After Compliance and Application.* After compliance with Sections 505.742 through 505.744 inclusive, the operator may apply to the Director for discovery well certification. Within 10 days of receipt of such request the Director will publish notice of such application allowing 30 days for any interested party to object to or protest the application. If no protest or objection is received by the Director, the Director will, within 70 days after the receipt of an application, either certify the well as in (a) or deny the application as in (c) of this section. If any protest or objection is made it must be submitted in writing to the Director within the specified 30 day period. After receipt of said protest or objection the Director will advertise and hold an open public hearing in accordance with the Alaska Land Act (AS 38.05) and in accordance with the Alaska Administrative Procedure Act (AS 44.62.300—AS 44.62.630). Within 30 days after such hearing the Director will do one of the following.

(a) Certify the well in question a first discovery well which has established oil and/or gas in commercial quantities in (*name geologic structure*) as of (*time*) on (*date*), and specify the date of commencement of the 10 year 5 per cent discovery royalty term which date shall be the first of the next succeeding month from the established date of initial discovery. After discovery well certification, no other well, regardless of when drilled, shall be eligible for consideration for certification as to the same geologic structure;

(b) Continue the hearing at a later specified date;

(c) Deny the application for discovery well certification.