Thomas E. KELLY, Commissioner of the Department of Natural Resources, et al., Appellants,

v.

Peter ZAMARELLO, Neil S. Mackay et al., Appellees.

Peter ZAMARELLO, Neil S. Mackay et al., Cross-Appellants,

v.

Thomas E. KELLY, Commissioner of the Department of Natural Resources, et al., Cross-Appellees.

Nos. 1255, 1256.

Supreme Court of Alaska.

July 6, 1971.

G. Kent Edwards, Atty. Gen., Juneau, Robert L. Hartig, James D. Rhodes, Asst. Attys. Gen., Anchorage, for appellants and cross-appellees.

Edgar Paul Boyko and James H. Lack, of Boyko & Walton, Anchorage, for appellees and cross-appellants.

## OPINION

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR, and ERWIN, JJ.

CONNOR, Justice.

This case challenges certain administrative actions of defendants Thomas E. Kelly, Commissioner of Natural Resources, and F. J. Keenan, Director, Division of Lands, in connection with the State of Alaska Competitive Oil and Gas Lease Sale No. 23, held September 10, 1960.

On August 11, 1969, the State of Alaska published its notice of the 23rd Competitive Oil and Gas Lease Sale. The notice of sale contained a description of the 179 tracts offered in the sale, indicated the time and place of the sale, and provided further in part:

"LEASE AWARDS

"A lease will be awarded on each tract to the responsible qualified bidder offering the highest cash bonus for that tract unless all bids on the tract are rejected or a preference right is exercised. If a lease is not issued to a bidder whose bid is retained, the lands in the tract will be held and be subject to nomination and offering at a later sale.

\*    \*    \*    \*    \*    \*

"(b) A double envelope system will be used. \* \* \* The inner envelope shall state on the outside: Name and address of the bidder(s); amount of bonus bid per acre; total amount of bid; and tract designation number. The inner envelope shall contain the bid and the bid deposit. The bid shall be submitted in duplicate on form DL–5 (revised 5/67) or image copy thereof, and shall be accompanied by one or more cashier's or certified checks \* \* \* or money order, or cash or any combination thereof in a total amount of at least 20 percent (20%) of the amount of the bid.

"(c) No executed lease form DL–1 need be included with the bids.

\*    \*    \*    \*    \*    \*

"SUCCESSFUL BIDS

\*    \*    \*    \*    \*    \*

"(d) The royalty rate on production shall be twelve and one-half percent (12½%)."

Plaintiffs submitted bids on 35 of the 179 tracts offered in the sale.[1] These 35 bids offered bonuses in the form of a combination of cash plus a premium royalty rate above the 12½% rate fixed in the notice of sale.[2] In conducting the sale, the defendants sorted through the bids, considering only the cash figure on the outside of the inner envelope of each bid. Once the apparent high cash bid for each tract was located in this manner, the bids showing lower cash offerings were returned to the bidders without further consideration. None of plaintiffs' bids was accept-

1. Plaintiffs Boyko, Zamarello and Webster submitted joint bids on 10 tracts; plaintiffs Inlet Oil and APCO Oil submitted joint bids on another 10 tracts; plaintiffs Boyko, Zamarello and Mackay submitted joint bids on 15 tracts.

2. Each of the ten Boyko-Zamarello-Webster bids offered $1.25 per acre (a total cash bonus of $3,200) and a royalty rate of 37.5%. The fifteen Boyko-Zamarello-Mackay bids, which included the apparent high bids on tracts C23–020 and C23–021, offered $1.50 per acre (total cash bonus of $3,740) and a royalty rate of 37.5%. The ten Inlet-APCO bids offered $104,678.40 total cash bonus for each tract and a royalty of 27.5%.

ed. Higher cash offerings were made by other bidders on 33 of the 35 tracts on which plaintiffs submitted bids. Plaintiffs' bids on tracts C23–020 and C23–021 were first announced at the sale as the apparent high cash bids for those tracts, but were later rejected by defendants on the ground that they were nonresponsive to the notice of sale.

On September 17, 1969, after the return to plaintiffs of the 33 unsuccessful bids, but before notification of the rejection of the two high bids, plaintiffs filed suit against defendants Kelly, Keenan, and the seventeen oil companies that were the successful high bidders on the 33 tracts.[3] Plaintiffs' complaint alleged that defendants Kelly and Keenan had exceeded their jurisdiction and authority and had misinterpreted the law, first, by failing to recognize plaintiffs as apparent high bidders on the 33 tracts and, second, by failing to consider the extra royalty portions of the bids submitted by plaintiffs.[4] Plaintiffs sought an injunction restraining defendants from making formal bid awards and, in the alternative, asked the court to review and set aside the administrative acts of defendants Kelly and Keenan.[5]

On October 16, 1969, defendants Kelly and Keenan filed, along with their answer to plaintiffs' complaint, a motion for summary judgment. Plaintiffs thereafter moved for partial summary judgment only as to the two apparent high bids on tracts C23–020 and C23–021. After hearing, the superior court granted partial summary judgment for defendants, finding that the 33 bids "were properly not further considered by defendants Kelly and Keenan, in that said bids were nonresponsive to the Notice of Sale and the leasing regulations and statutes applicable to the 23rd Oil and Gas Lease Sale." In addition, the lower court granted partial summary judgment for plaintiffs as to their two apparent high bids, finding that these bids were *improperly* rejected as nonresponsive and remanding them to the Commissioner of Natural Resources for consideration as to the adequacy of the cash bonus offered in the bids. Plaintiffs appeal from the orders granting both summary judgments. Defendants appeal from the order granting partial summary judgment for the plaintiffs.

## THE 33 BIDS

Plaintiffs argue that defendants were required by statute to consider both the cash amount and the value of the extra royalty in ascertaining the highest bid. In pursuing this argument, plaintiffs challenge the validity of certain oil and gas regulations which provide that competitive bidding shall be by cash bonus bids only.[6]

Regulations adopted by the Commissioner of Natural Resources are subject to the rule-making provisions of Alaska's Administrative Procedure Act and must be

---

3. The oil companies have not been served and are not involved in these appeals.

4. Plaintiffs maintain that had defendants considered the value of the extra royalty offered in their bids that the bids would have been far more valuable than the cash only bids determined by defendants to be the successful high bids on the 33 tracts.

5. An amended complaint was filed October 21, 1969, which added a new claim against the oil companies, charging them with collusive practices. The body of the original complaint, as well as the amended complaint, makes reference throughout to "thirty-three tracts," although the exhibit attached to both complaints lists all 35 bids. To avoid any confusion, the court,

pursuant to stipulation by the parties, corrected the amended complaint to read "thirty-five (35) tracts" to include unquestionably the bids on tracts C23–020 and C23–021.

6. 11 Alaska Admin. Code, § 505.11 states in part:
   "Competitive lands may be leased only upon competitive bidding by cash bonus bids submitted in response to a published notice of lease offer. * * *"
   11 Alaska Admin. Code, § 505.51 states:
   "Within a reasonable time following the lease sale, the Director shall award the lease to the responsible qualified bidder offering the highest cash bonus and complying with the bid requirements unless all bids are rejected."

adopted according to the procedures set forth therein.[7] Among the required procedures for adoption of regulations are notice of the proposed adoption,[8] a public hearing in which any interested person may submit statements to the agency,[9] filing of the regulation, if adopted, with the secretary of state,[10] and publication.[11] AS 44.62.210(a) also provides, in part, "The state agency shall consider all relevant matter presented to it before adopting, amending or repealing a regulation." Plaintiffs do not challenge the adoption procedures for the natural resources regulations here attacked, so we may presume that the official duty was regularly performed,[12] and that the challenged regulations were adopted pursuant to the procedures outlined above.

The rule-making function of an administrative agency frequently resembles the legislative process of passing a statute. Each entity determines the need for a particular enactment in light of chosen policies; each has procedures for the expression of views upon the merits of the proposal; and each, after consideration of the relevant policies and arguments, decides whether to adopt the proposed enactment. When administrative rule-making is based upon clear authority from the legislature to formulate policy in the adoption of regulations, the rule-making activity takes on a quasi-legislative aspect. We have held that, under proper standards, such delegations of legislative power to administrative agencies are constitutional. Boehl v. Sabre Jet Room, Inc., 349 P.2d 585 (Alaska 1960).

In the federal system, when an administrative agency is clearly acting in its quasi-legislative rule-making capacity, the United States Supreme Court has not substituted its judgment as to the content of the rule or regulation.[13] On the other hand, where it appears that the adoption of a regulation concerns merely the interpretation of a statute, the United States Supreme Court may give the agency's interpretation weight, but such interpretation is not controlling.[14] Professor Davis characterizes the difference in judicial attitude toward certain administrative rules as a distinction between "legislative regulations" and "interpretative regulations." He has defined "legislative rule" as "the product of an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the legislative body."[15] "Interpretative rules", he states, "are rules which do not rest upon a legislative grant of power (whether explicit or inexplicit) to the agency to make law."[16] The distinction is not always easy to draw, since as Davis points out, "Interpretative rules sometimes rest upon statutory authority to issue them. * * *"[17] The distinction can be demonstrated better by examining representative cases than by an abstract definition.

American Telephone and Telegraph Co. v. United States, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936), concerned a legislative rule, although the Court did not specifically use that term. Section 220 of the Communications Act of 1934 provided that "the Commission may, in its discretion, prescribe the forms of any and all

---

7. AS 38.05.020(b) (1).

8. AS 44.62.190.

9. AS 44.62.210.

10. AS 44.62.040.

11. AS 44.62.130.

12. United Bonding Ins. Co. v. Castle, 444 P.2d 454, 458 (Alaska 1968); Irwin v. Radio Corp. of America, 430 P.2d 159, 161 (Alaska 1967).

13. Mitchell v. Budd, 350 U.S. 473, 76 S. Ct. 527, 100 L.Ed. 565 (1956); American

Trucking Ass'ns v. United States, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1952); American Tel. and Tel. Co. v. United States, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936).

14. Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

15. 1 K. Davis, Administrative Law Treatise § 5.03, at 299 (1958).

16. *Id.* § 5.11, at 358.

17. *Id.* § 5.03, at 300.

accounts, records, and memoranda" for telephone companies subject to the Act. Forty-four telephone companies brought suit challenging the accounting system prescribed by the Federal Communications Commission.

Because Congress had delegated to the Commission the authority to choose a system in its discretion, the Court would not substitute its judgment as to the content of the rule. Upholding the system, the Court stated:

"This court is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action here involved, it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be 'so entirely at odds with fundamental principles of correct accounting' [citation omitted] as to be the expression of a whim rather than an exercise of judgment. [citations omitted]. Then, too, in gauging rationality, regard must steadily be had to the ends that a uniform system of accounts is intended to promote." 299 U.S. at 236–237, 57 S.Ct. at 172, 81 L.Ed. at 147–148.[18]

■ An example of an interpretative regulation is the Alaska case of Whaley v. State, 438 P.2d 718 (Alaska 1968). Dolores Whaley had been discharged from her employment with the State of Alaska and brought suit seeking reinstatement of her position as Correctional Aide at the Anchorage State Jail. The lower court granted summary judgment to the state, having determined that since Mrs. Whaley was a provisional employee she was not entitled to an appeal and hearing before the State Personnel Board. On appeal to this court, appellant Whaley relied on AS 39.25.170, which states in part, "[a]n employee in the classified service who is dismissed, demoted, or suspended for more than 30 working days in a 12-month period" is entitled to a hearing before the personnel board. This court upheld the grant of summary judgment, finding that the Personnel Rules prepared by the Director of Personnel indicated clearly that "employee in the classified service" had been interpreted by the Board to include only employees who had permanent status. We stated at 722:

"The rules that we have referred to are interpretive of the law in that they result in a construction of the words 'employee in the classified service,' within the meaning of the statute, as referring only to employees who have attained a permanent status in their employment with the state, and not to probationary or provisional employees. * * * Such interpretive rules were made pursuant to statutory authority. * * * We have no basis for not upholding such an administrative interpretation of AS 39.25.170 particularly in view of the well settled rule that requires courts to give consideration and respect to the contemporaneous construction of a statute by those charged with its administration, and not to overrule such construction except for weighty reasons." [footnote omitted.][19]

18. *See also* National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) ; Allstate Ins. Co. v. United States, 329 F.2d 346, 349 (7th Cir. 1964) ; Ralphs Grocery Co. v. Reimel, 69 Cal.2d 172, 70 Cal.Rptr. 407, 444 P.2d 79 (1968) ; Pitts v. Perluss, 58 Cal.2d 824, 27 Cal.Rptr. 19, 377 P.2d 83 (1962).

19. AS 39.25.050 provides that the director of personnel shall "prepare the rules, not inconsistent with this chapter, which are required to implement and administer this chapter." The scope of these rules is limited severely in AS 39.25.150, leaving the director of personnel very little discretion and virtually no policy-making power. It should be noted also that under AS 39.25.140(e) personnel rules are not subject to the adoption procedures set forth in the Administrative Procedure Act.

We upheld the construction which the Personnel Board had placed upon the statute, but had there been "weighty reasons," we would not have hesitated to substitute our own construction of the statute.[20] The legislative-interpretative distinction has particular importance in the federal administrative system, since the federal Administrative Procedure Act exempts from the usual requirements of notice and hearing the adoption of "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice."[21] We believe, nonetheless, that the distinction between legislative and interpretative rule-making is a helpful one when reviewing regulations adopted by state administrative agencies. We hold, therefore, that when a regulation has been adopted under a delegation of authority from the legislature to the administrative agency to formulate policies and to act in the place of the legislature, we should not examine the content of the regulation to judge its wisdom, but should exercise a scope of review not unlike that exercised with respect to a statute. As stated by the United States Supreme Court nearly a century ago:

"When once it is established that congress possesses the power to pass an act, our province ends with its construction and its application to cases as they are presented for determination."[22]

Certain provisions of the Alaska Administrative Procedure Act provide guidance as to the standard of review for regulations adopted pursuant to an administrative agency's quasi-legislative rule-making function. AS 44.62.020 states in part:

"To be effective, each regulation adopted must be within the scope of authority conferred and in accordance with standards prescribed by other provisions of law."

AS 44.62.030 states:

"If, by express or implied terms of a statute, a state agency has authority to adopt a regulation to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid' or effective unless consistent with the statute and reasonably necessary to carry out the purpose of the statute."[23]

■ Thus, where an administrative regulation has been adopted in accordance with the procedures set forth in the Administrative Procedure Act, and it appears that the legislature has intended to commit to the agency discretion as to the particular matter that forms the subject of the regulation, we will review the regulation in the following manner: First, we will ascertain whether the regulation is consistent with and reasonably necessary to carry out the purposes of the statutory provisions conferring rule-making authority on the agency. This aspect of review insures that the agency has not exceeded the power delegated by the legislature. Second, we will determine whether the regulation is reasonable and not arbitrary. This latter inquiry is proper in the review of any legislative enactment.

---

20. For other examples of interpretative regulations, *see* Garelick Mfg. Co. v. Dillon, 114 U.S.App.D.C. 218, 313 F.2d 899 (1963); Gibson Wine Co. v. Snyder, 90 U.S.App.D.C. 135, 194 F.2d 329 (1952).

21. 5 U.S.C.A. § 553(b) (A) (1966).

22. Chae Chan Ping v. United States, 130 U.S. 581, 603, 9 S.Ct. 623, 629, 32 L.Ed. 1068, 1074 (1889).

23. *Cf.* 1 K. Davis, Administrative Law, § 5.03, at 299:
"When a rule is legislative, the reviewing court has no authority to substitute judgment as to the content of the rule, for the legislative body has placed the power in the agency and not in the court. A legislative rule is valid and is as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable."

Applying the standard, then, to the challenged regulations, we must first look to the legislative enactment here involved. AS 38.05.180(a) governs competitive oil and gas leasing and provides in part:

> "*Oil and gas.* (a) * * * Whenever oil and gas is discovered in commercial quantities, the commissioner shall determine the extent of the area of lands * * * which, by reason of the discovery, the commissioner reasonably believes to be capable of producing oil or gas, and the additional *lands shall be leased to the highest responsible qualified bidder by competitive bidding under general regulations * * * upon the payment by the lessee of such bonus as may be accepted by the commissioner and of such royalty as may be fixed in the lease which shall not be less than 12½ per cent* in amount or value of the production removed or sold from the lease." (Emphasis added.)

AS 38.05.020(b) (1) of the Alaska Land Act provides that the Commissioner may "establish reasonable procedures and adopt reasonable rules and regulations necessary to carry out" the provisions of the state's land act.

■ Plaintiffs argue that the clear language of AS 38.05.180(a) requires that the royalty be included along with "such bonus as may be accepted" in ascertaining the highest bidder, and that defendants' regulations providing otherwise are consequently inconsistent with the statute. We cannot agree. The only reasonable construction that can be placed on the statute is that the legislature intended to give the Commissioner broad authority to determine the kind of bonus he will accept. The legislature at the time it passed AS 38.05.180(a) was undoubtedly aware that under competitive bidding procedure, different forms of bonuses might be offered. It did not itself prescribe a particular form, but instead provided that competitive bidding shall be "under general regulations," and that lands shall be leased upon the payment of "such bonus as may be

accepted by the commissioner." The plain language of the statute shows that royalties were to be fixed independently of the acceptance of the highest bonus.

■ Our next point of inquiry is whether, in light of the purposes of AS 38.05.180 (a), the challenged regulations are reasonable and not arbitrary. It is clear that the provisions of AS 38.05.180(a) were intended to insure that leases on valuable oil and gas producing state lands will be made available to the public on a fair and equitable basis, that the state will be adequately compensated for its natural resources, and that the state's resources are developed in an orderly fashion. For the Commissioner to decide that these purposes are furthered by providing for bidding by cash bonus cannot be said to be unreasonable. Cash bonuses allow the Commissioner and the Director of the Division of Lands to determine quickly and easily which bid is the highest. A successful bidder who ultimately becomes a lessee of oil and gas rights must be able to feel that his lease will not be subject to attack. He will quite naturally be reluctant to invest large sums of money into drilling and recovery operations if he anticipates long court battles to determine the true value of his bid. Delays of that kind do not comport with orderly development of resources.

Similarly, it is not unreasonable for the Commissioner to determine that it is in the state's best interest to receive compensation for the leases immediately upon the award of the lease, rather than to wait for uncertain sums to arrive in the form of premium royalties. Plaintiffs would have this court substitute its judgment on the merits of cash bidding, but this we will not do.

The Commissioner's judgment on this matter no doubt reflects consideration of scientific and economic data well within the field of expertise of the Department of Natural Resources. In selecting cash bidding and a 12½% royalty rate as the best policy for the state, the Commissioner no

doubt had to evaluate a number of imponderables within his field of expertise.

It may well be that the prospect of recovering large amounts of oil from these tracts is most promising. Yet other factors would have to be weighed in determining the terms of sale. Problems inherent in the marketing of the oil and gas, including transportation of the product over long distances, would have to be considered. The overall economics of the oil and gas industry, on a national and international basis, and the estimated future demand for oil and gas as a basic energy source, might well have to be considered in fixing terms of sale which would yield maximum fulfillment of Alaska's avowed public policy. For all we know, a high royalty rate and a low cash bonus bid might impede the extraction and marketing of the resource, thereby defeating orderly. development of the oil and gas at the best long-term compensation to the state and its citizens. But these are problems of public policy the resolution of which is soundly placed in the legislative and executive branches of government, not the judiciary.

To plunge the courts into such an evaluative process, before a lease could be awarded in response to a bid, would surely lead to such interminable delay in the award of leases as to defeat the whole program of resource development. The very economic data to be evaluated might change so rapidly that final judicial action would be most difficult to achieve. This illustrates why the judicial process does not lend itself to the solution of such problems of policy formulation.

The use of cash bonus bids is consistent with the definitions of "bonus" that courts have formulated. Plaintiffs have cited several cases which define "bonus" to mean cash plus royalty. Defendants, on the other hand, accurately point out that "bonus" has been defined a number of different ways. The case of Griffith v. Taylor, 156 Tex. 1, 291 S.W.2d 673, 676 (Texas 1956), had this to say about the definition of "bonus":

"In its broadest sense 'bonus' is any consideration given for a lease over and beyond the usual ⅛th royalty, whether the additional consideration be paid or payable and whether paid in cash or payable out of production. * * *

"In its broadest aspect 'royalty' is 'a share of the product or profit reserved by the owner for permitting another to use the property.' [citations omitted.] In this broad sense a sum certain to be paid out of production, although 'bonus,' in that it is consideration in addition to the usual ⅛th royalty, would also be 'royalty.'

"Thus it may be that the words 'bonus' and 'royalty' in their broadest concepts and meanings are conflicting and overlapping. On the other hand, when it is necessary that they be distinguished there is a narrower concept of the two terms as they are ordinarily and commonly used and understood in the oil and gas industry in which they do not conflict but are harmonious. In this narrower sense a reservation or a payment of a *part or percentage* of production under a lease which is to continue throughout the life of the lease is regarded as 'royalty,' and a *sum certain* to be paid in cash or out of production is regarded as 'bonus.' (Emphasis added.)

Obviously, defendants have chosen the concept of "bonus" most commonly encountered in the oil and gas industry, and in so doing have acted neither unreasonably nor arbitrarily.

Therefore, we hold that in considering only the cash portion of plaintiffs' 33 bids, defendants acted pursuant to valid regulations which provided that a lease would be awarded to the bidder offering the highest *cash* bonus. Since other bids on the 33 tracts contained higher cash offerings than plaintiffs' bids, the defendants acted properly in determining that the high cash bids on those 33 tracts were the apparent high bids, not plaintiffs' bids. We sustain the result reached by the superior court, but do not adopt its reasoning, since we find that

the record does not support the view that the 33 bids were rejected because they were nonresponsive.

Plaintiffs urge finally that summary judgment was improper as to the 33 bids because of the complex important public issues that were at stake, and cite Ault v. Alaska State Mortgage Association, 387 P. 2d 698 (Alaska 1963), in support of their argument. This Court found summary judgment improper in *Ault* not only because important public issues were involved, but also because we found the evidence presented in support of the motion to be inadequate since "it affords us no basis for resolving the questions raised by the appellant's eight specifications of error." The opinion also states at 701–702:

> "We are not holding that summary judgment procedure in cases of this nature is unacceptable. We do hold that if summary procedure is employed in cases involving important public issues where any fact is in dispute the trial judge should not attempt to render a decision unless he is satisfied that the evidence, both pro and con, is sufficient to give him the necessary background of knowledge."

We believe the record in this case was adequate and that no "genuine issue as to any material fact" existed.[24] Summary judgment was therefore proper.

## THE TWO APPARENT HIGH BIDS

■ The bids submitted by plaintiffs Boyko, Zamarello and Mackay on tracts C23–020 and C23–021 were rejected by the Department of Natural Resources in a decision dated September 29, 1969, signed by the Acting Director of the Division of Lands, and stating in part as follows:

> "1. The bids submitted were non responsive to the notice of sale in that the bids in question contained conditions, attachments and interlineations other than those contained in bid form DL–5.
>
> \*   \*   \*   \*   \*   \*
>
> "2. The bids submitted were non responsive in that contrary to the Notice of Sale and Applicable Regulation the said bids provided for a combination cash bonus and a royalty rate other than that specified in the notice of sale coupled with a proposed alteration to Form DL–1.[25]

The two bids were substantially identical, and both were submitted on the state's Form DL–5, revised May, 1967.[26] In the blank space provided for "Amount of Bid" both bids had the figure $3,740.00 immediately followed by an asterisk. This asterisk made reference to an attached Exhibit A. The same exhibit was attached to both bids and provided in part as follows:

> "This is a combination cash bonus and Extra Royalty Bid whereby bidders offer a cash bonus of $1.50 per acre or a total cash bonus of $3,740.00 plus a total Royalty to the State of Alaska of 37.5% of all oil, gas and associated substances produced, saved, removed, or sold from said land; amounting to a bonus royalty of 25% over and above the usual 12.5% royalty, which bonus royalty has a reasonable value of $45,000.00 per acre, or a

24. Alaska R.Civ.P. 56(c) states in part: "Judgment shall be rendered forthwith if the pleadings, depositions and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."

25. 11 Alaska Admin.Code, § 505.31 provides:
"Bids must be signed and submitted on a bid form supplied by the Division

for the particular lease offer or a verbatim copy thereof. In most cases the bid form will be substantially like Form Number DL–5. Any bid containing, or accompanied by, or submitted upon, or with any condition, qualification or material alteration will be rejected."

26. An additional sentence had been added to the form which stated, "2 Copies of lease, executed by Lessees, are submitted herewith."

total value of $115,200,000.00 as shown by the statement below."[27]

Plaintiffs included lease forms with both bids, although the notice of sale indicated that this was not necessary.[28]

Plaintiffs argued successfully in the superior court and argue now on appeal that the offer of the additional royalty should not have rendered the bids nonresponsive to the notice of sale requiring bidding by cash bonus only. Plaintiffs contend that the offer of the additional royalty was contained only in the lease form, not in the bid itself. Therefore, since defendants' notice of sale indicated that the lease form need not be included with the bid, the offered extra royalty should have been considered mere surplusage.[29]

We find that the superior court erred in substituting its judgment for that of the Department of Natural Resources both as to the Department's finding that the bids themselves contained the offer of the additional royalty and as to the finding that the bids were nonresponsive. The decision by the Department of Natural Resources is a proper one for application of the reasonable basis standard of judicial review.

The Oregon Supreme Court in Rogers Construction Co. v. Hill, 235 Or. 352, 384 P.2d 219 (1963), discussed the problems of judicial review of administrative decisions. In that case the Public Utilities Commissioner had applied Oregon's highway use tax to certain of plaintiff's construction equipment, finding that under the Oregon statute the equipment was "capable of being used upon any public highway in

---

**27.** Each exhibit included the following statement:

"STATEMENT

"THE FOLLOWING TABLES, PREPARED ACCORDING TO STANDARD ENGINEERING METHODS, DISCLOSE THE TOTAL BONUS AND ROYALTY THE STATE OF ALASKA FROM A 2,560 ACRE PRODUCING* LEASE:

"12.5% ROYALTY, $10,000.00 PER ACRE BONUS:

| "Royalty | $57,600,000.00 |
| Bonus | 25,600,000.00 |
| TOTAL | 83,200,000.00 |

"37.5% ROYALTY, $1.50 PER ACRE BONUS:

| "Royalty | $172,800,000.00 |
| Bonus | 3,840.00 |
| TOTAL | 172,803,840.00 |

* These estimates are based on 300' of saturated pay sand (½ that reported in some Prudhoe Bay wells), a recovery of 200 barrels of oil per acre foot of pay sand and a price of $3.00 per barrel at the well head."

In addition, the exhibit proposed to add to the terms of the lease a commitment to drill a test well "on said leased premises, or an adjoining lease" within three years from the date of execution of the lease.

**28.** The notice stated, "(c) No executed lease form DL–1 need be included with the bids."

---

**29.** The superior court apparently accepted this argument and based its order thereon. At the hearing on the motions for summary judgment, the court stated:

"I feel that they [the two apparent high bids] should be considered on the basis of the adequacy of the cash bonus and that the enclosure in the bid envelope of—of a royalty bid and drilling commitment would be surplusage and that

the—the enclosure of the form DL–1 [the lease form] could be disregarded as—as not part of the bidding documents because it was not called for by the bid invitation.

\*　　\*　　\*　　\*　　\*

"And I feel that those [bids] must be remanded to the Commissioner for consideration of the adequacy of the cash bonus bid."

this state." The superior court affirmed the Commissioner's finding. On appeal, the Commissioner urged that the court should uphold the agency determination if it had "warrant in the record" or a "reasonable basis in law." The court disagreed, and, substituting its own judgment, reversed the Commissioner's determination.

In reaching its decision to apply the substitution of judgment standard of judicial review, the court recognized two distinct types of administrative decisions on questions of law. One type involves questions in which the particularized experience and knowledge of the administrative personnel goes into the determination. When this type of question is presented to the court for review, deference should be given to the administrative interpretation, since the expertise of the agency would be of material assistance to the court. "The amount of deference will vary depending upon the apparent degree of reasonableness of the administrative decision and the degree to which the problem involves knowledge peculiar to an industry, business, etc." 384 P.2d at 222, 235 Or. at 356.

The other kind of case presents questions of law in which knowledge and experience in the industry affords little guidance toward a proper consideration of the legal issues. These cases usually concern statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience. Consequently, courts are at least as capable of deciding this kind of question as an administrative agency.

The decisions rendered by our court reflect this distinction. In Northern Corporation v. Saari, 409 P.2d 845 (Alaska 1966), this court substituted its judgment for that of the Workmen's Compensation Board as to the proper legal definition of "arising out of and in the course of" employment. We similarly substituted judgment on ques-

tions of law in Aleutian Homes v. Fischer, 418 P.2d 769 (Alaska 1966), deciding the proper definition of "occupational disease." In Cook v. Alaska Workmen's Compensation Board, 476 P.2d 29 (Alaska 1970), we afforded the Board's interpretation of statutes prescribing the rules of evidence to be followed in workmen's compensation hearings little, if any, weight. All of these cases presented questions of law which had been decided by courts in a large number of cases.

Representing the other class of questions of law is the recent case of Pan American Petroleum Corp. v. Shell Oil Co., 455 P.2d 12 (Alaska 1969). There we applied a narrower standard of review to a decision by the Commissioner of Natural Resources, the standard being what is called the "reasonable basis" approach. The Commissioner had found that Pan American had made the "first discovery of oil or gas in commercial quantities in a geologic structure" [30] and was therefore entitled to a substantially reduced royalty rate. "[I]n light of the policy considerations and the particularized complexity of the subject matter," [31] we found the reasonable basis test rather than a substitution of judgment to be proper. We held that the Commissioner's factual finding had substantial support in the record and that his interpretation of the term "commercial quantities" had a reasonable basis in law.

Application of the reasonable basis test is extremely useful where the administrative action under review resembles executive as opposed to legislative or judicial activity. Agency decisions such as the one reviewed in *Pan American* and the decision here under review clearly have nothing to do with the agency's rule-making function. To the extent that the decision-making process in *Pan American* and the case here required application of law to facts, the decisions might be

30. AS 38.05.180(a). The quoted language was deleted by § 1 Ch. 65 SLA 1969 less than a week before the *Pan American* decision was announced.

31. 455 P.2d at 22.

said to resemble judicial activity, but there the similarity ends. In the case at bar, the decision of the Department of Natural Resources that plaintiffs' bids were not responsive to the published notice of sale was incidental to the execution of the competitive leasing provisions of the Alaska Land Act. Similarly, in *Pan American*, the decision that Pan American Oil Corporation was entitled to a reduced royalty rate was made in discharge of the Commissioner's duty to enforce the statutory policy that oil discoveries should be encouraged by rewarding the discoverer with a financial benefit.

The reasonable basis approach, in the review of agency action which is essentially executive in character, recognizes that the application of law to facts in an administrative setting may require techniques quite different from those traditionally associated with judicial functions. The United States Supreme Court has used the reasonable basis approach in cases where it appeared to the Court that the agency was particularly well suited to draw the necessary factual and legal conclusions.[32] On the other hand, where the agency's decision was not one within its ambit of specialized knowledge, the Court has applied a much broader standard of review and has in these cases substituted its own judgment on the law.[33] We believe that the reasonable basis approach should be used for the most part in cases concerning administrative expertise as to either complex subject matter or fundamental policy formulations.

While the type of administrative expertise in the case at bar differs somewhat from that in the *Pan American* case,[34] we find the reasonable basis standard appropriate for the disposition of the issue before us. A decision rejecting a bid for nonresponsiveness has application beyond the instant case, going to the integrity of the entire competitive bidding process. In the present case it is not difficult to perceive valid reasons for the rejection of the plaintiffs' bids as unresponsive. The Commissioner may well believe that a finding of nonresponsiveness, applied to bids offering combination bonuses of cash plus a premium royalty, will act as a deterrent to future bidders who would, as plaintiffs apparently did, prefer to keep their cash investment relatively low, and offer the state premium royalty rates to make up for the cash deficiency. Tacit approval of bids such as plaintiffs' might encourage submission of similar bids in future sales, thereby undermining the policies underlying both the decision to fix the royalty at a particular rate and the decision to obtain cash bonuses as high as possible. The Commissioner could have determined, as a matter of policy, that royalty rates in excess of 12.5% would not have promoted orderly and expeditious development of the resources on the state's lands.[35]

32. Udall v. Tallman, 380 U.S. 1; 85 S.Ct. 792, 13 L.Ed.2d 616 (1964); Unemployment Comp. Comm'n v. Aragon, 329 U.S. 143, 67 S.Ct. 245, 91 L.Ed. 136 (1946); Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301 (1941).

33. Texas Gas Transmission Corp. v. Shell Oil Co., 363 U.S. 263, 80 S.Ct. 1122, 4 L. Ed.2d 1208 (1960); N.L.R.B. v. Highland Park Mfg. Co., 341 U.S. 322, 71 S.Ct. 758, 95 L.Ed. 969 (1951); Packard Motor Car Co. v. N.L.R.B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

34. The Commissioner's decision in *Pan American* was based on evidence of a highly technical nature, while the decision in the case at bar rests more on the policies underlying strict enforcement of bidding procedures. *Pan American*, however, like our case here, also involved policy formulations with which we felt the court should not interfere; namely, policies regarding the award of discovery royalties inherent in establishing criteria to be applied in making such awards.

35. The plaintiffs' bids contained clauses providing for termination of the leases in the event that exploratory drilling was not initiated within a fixed period of time. However, we fail to see how these clauses could have adequately protected the state's interest in development of the resources on its land. The drilling commitment made in these clauses was restricted to the commencement of exploratory wells. According to the terms of

There are similarly valid reasons why the Commissioner might have been reluctant to treat the plaintiffs' offer of 37.5% royalty as mere surplusage. Plaintiffs' bid was, in contractual terms, an offer to enter into a lease with the state. In order to treat the plaintiffs' bid of 37.5% royalty as surplusage, the state would have been forced to make a counter-offer, subject to acceptance by the plaintiffs. A renegotiation of the terms of the leases would thus have been required, and the respective legal positions of the state and the plaintiffs. would have been altered. It is precisely to obviate the necessity for such additional renegotiation and clarification that strict compliance with the rules of bidding has traditionally been required. Furthermore, acceptance of the plaintiffs' bid at a royalty rate of 12.5% might properly have been deemed highly undesirable since it would have required leasing the land at a price substantially below the value initially offered by the plaintiffs. We do not pretend to know the precise motivation of the Commissioner in rejecting the plaintiffs' bids on tracts C23–020 and C23–021; it is sufficient for our purposes to note that there are reasonable bases to support such a rejection.

Applying the reasonable basis standard, we cannot say that the finding of non-responsiveness lacked either substantial support in the record or a reasonable basis in law. As to the factual aspect of the finding, the form of plaintiffs' bids easily supports an inference that plaintiffs intended that the offer of the added royalty be considered a part of the bid itself. The exhibit attached to both bids stated, "This is a combination cash bonus and Extra Royalty Bid, whereby bidders offer a cash bonus of $1.50 per acre * * * plus a total royalty * * * of 37.5%

* * *." On the face of the bids, reference was made to this exhibit in the space provided for "Amount of Bid." It was, therefore, error for the superior court to substitute its judgment and regard the extra royalty as mere surplusage.[36]

There is considerable authority to the effect that public policy requires carefully drawn public competitive bidding standards and strict compliance with such standards. The basic theory behind such holdings is expressed in Inn Operations, Inc., v. River Hills Motor Inn Co., 152 N.W.2d 808, 817 (Iowa 1967):

"Public policy underlies the requirements of competitive bidding. The purpose of the statute is that each bidder, actual or possible, shall be put upon the same footing. * * * If any bidder is relieved from conforming to the conditions which impose some duty upon him, or from strict performance of the terms of the invitation to bid, such bidder is not contracting in fair competition with those bidders who propose to be bound by all conditions." [37]

The Court of Appeals for the District of Columbia Circuit in Superior Oil Company v. Udall, 133 U.S.App.D.C. 198, 409 F.2d 1115 (1969), in an opinion by now Chief Justice Burger, held that the Secretary of the Interior could not award an oil and gas lease to a bidder who had failed to sign the bid, where an authorized officer of the Bureau of Land Management had previously rejected the bid. In reaching its decision, the court emphasized the importance of strict compliance with bidding procedures, and quoted with approval the following excerpt from an opinion by the Comptroller General:

"[T]he strict maintenance of the competitive bidding procedures required by

---

the clause, if the plaintiffs failed to meet the commitment, the result would merely be termination of the lease, and the state would be entitled to no additional compensation for the failure to develop resources on the lands.

36. Pan American Petroleum Corp. v. Shell Oil Co., 455 P.2d 12 (Alaska 1969),

Keiner v. City of Anchorage, 378 P.2d 406 (Alaska 1963).

37. See also, Parks v. City of Pocatello, 91 Idaho 241, 419 P.2d 683 (1966); Juice Bar Corp. v. Township Committee, 36 N. J.Super. 164, 115 A.2d 131 (1955); Southern Steel Co. v. County of Suffolk, 51 Misc.2d 198, 273 N.Y.S.2d 99 (1966).

law is infinitely more in the public interest than obtaining a pecuniary advantage in individual cases by permitting practices which do violence to the spirit and purpose of the law." 409 F.2d at 1119–1120.

The court went on to say:

"The requirement of steadfast compliance with competitive bidding procedures * * * is an indispensable ingredient to the maintenance of competitive bidding processes which will engender public confidence and that of persons dealing with the Government." 409 F.2d at 1120.

The superior court, therefore, erred in overturning the decision of the Department of Natural Resources which declared plaintiffs' bids to be nonresponsive to the notice of sale.

The judgment of the superior court granting partial summary judgment for defendants is affirmed. The judgment of the superior court granting partial summary judgment for plaintiffs is reversed and remanded with directions to reinstate the decision of the Department of Natural Resources dated September 29, 1969, rejecting plaintiffs' bids on tracts C23–020 and C23–021.

Affirmed in part, reversed in part.