Joe McKINNON, Bill Parker, and the Alaska Public Interest Research Group, Appellants,

v.

The ALPETCO COMPANY, Alaska Petrochemical Company, Charter Oil (Alaska) Inc., E. F. Hutton (Alaska), Inc., State of Alaska, Robert E. LeResche, Commissioner of Natural Resources, and the Alaska Royalty Oil & Gas Development Advisory Board, Appellees.

No. 5546.

Supreme Court of Alaska.

Sept. 18, 1981.

John S. Hedland and James D. Grandjean, Hedland, Fleischer & Friedman, Anchorage, for appellant.

Robert M. Maynard, Asst. Atty. Gen., and Wilson L. Condon, Atty. Gen., Juneau, for appellees State of Alaska, Robert E. LeResche, and the Alaska Royalty Oil & Gas Development Advisory Bd.

Stephan H. Williams, Law Offices of Charles E. Cole, Fairbanks, for appellees The Alpetco Co., Alaska Petrochemical Co., Charter Oil (Alaska), Inc., and E. F. Hutton (Alaska), Inc.

Before RABINOWITZ, C. J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

COMPTON, Justice.

This controversy revolves around an amendment to a contract between the State of Alaska and the Alaska Petrochemical Company ("Alpetco"),[1] by which the state is selling 75,000 barrels a day of its royalty oil to Alpetco. McKinnon and Parker, who were legislators at the time the contract was amended, and the Alaska Public Interest Research Group (hereafter collectively referred to as McKinnon) brought an action in the superior court against Alpetco and the state. McKinnon alleged that various procedural errors occurred during the negotiation and approval of the amendment. He contended that these errors invalidated the amendment and that the original contract is no longer of any force or effect. The relief he sought was a declaratory judgment that the state has no obligation or authority to deliver royalty oil to Alpetco and an injunction restraining the Commissioner of Natural Resources from permitting the delivery of this oil to Alpetco. Both sides moved for summary judgment. The motion of the state and Alpetco was granted on the dual bases that McKinnon's action was without merit and that McKinnon did not have standing to maintain the

action. McKinnon has appealed. For the reasons discussed below, we affirm the superior court's judgment.

## I.

## FACTS

The state receives a one-eighth royalty share of all gas and oil produced from state leases executed prior to December, 1979. See AS 38.05.180. In accordance with the statutory scheme set forth in AS 38.06.010–.080, the Alaska Royalty Oil and Gas Development Advisory Board ("Royalty Board") studies matters relating to the state's royalty oil and gas. It directs the Commissioner of Natural Resources ("Commissioner") to solicit bids and proposals for the royalty oil and gas. The sale of royalty oil is to occur through competitive bidding unless the Commissioner, with the approval of the Royalty Board, waives competitive bidding on the ground that to do so is in the best interest of the state or that no competition exists. At the time this action was brought, the Royalty Board was required to approve or disapprove any dispositions of royalty oil and gas.[2] Any "sale, exchange or other disposition" of royalty oil must be approved by the legislature under most circumstances.[3]

In 1977, considerable interest and disagreement arose about how the state could make maximum use of the royalty oil that would be obtained from the Prudhoe Bay leases. Many people wanted the state's royalty share to be used to encourage the development of oil and gas industries in the state by subsidizing these developments through the sale of royalty oil at prices

1. Since the time of the original contract, Alpetco has become the Alaska Oil Company. For ease of reference, however, it will be referred to as Alpetco throughout this opinion.

2. AS 38.06.050, amended by ch. 112, § 5, SLA 1980. Effective June 21, 1980, the Board is only required to review dispositions and make a recommendation to the Commissioner. The change is irrelevant to this action.

3. Until 1980, AS 38.06.055 provided, in part, that "no sale, exchange or other disposition of oil or gas ... may be made by the commission-

er of natural resources ... without the prior approval of the legislature by a concurrent resolution concurred in by a majority of the members of each house except for sales, exchanges, or other dispositions made for a term of no more than one year, which may be entered into to relieve a shortage of storage capacity." Effective June 21, 1980, ch. 112, § 6, SLA 1980 amended this section to provide, in part, that the "legislature may approve a sale, exchange, or other disposition of oil or gas ... only by enacting legislation."

below market value. Some people wanted many small industries, while others wanted large projects. Yet others did not want oil and gas industries at all, preferring that the royalty·oil be used to encourage different types of industries or that the oil be sold for the maximum price possible and the profits be distributed directly to the people of the state.

The Commissioner decided to solicit proposals from private companies to enter into a contract whereby the state would sell its royalty oil to a company at reduced prices in exchange for which the company would build an oil processing facility in the state. Competitive bidding was formally waived. Eleven proposals were received, four of which were given serious consideration. Ultimately, the state selected Alpetco's proposal. Alpetco had suggested that it would build a $2.5 billion petrochemical facility in Alaska if the state would sell it 150,000 barrels of oil per day at the "in value" price that the state would have received for the oil from the producers.[4] A contract to this effect was entered into with the state and it was approved by the Commissioner and the Royalty Board. After a few changes were made, the legislature approved the contract on June 18, 1978.

McKinnon asserts that everyone involved with the contract at this stage realized that Alpetco's proposal was extremely speculative, particularly as to the matter of whether Alpetco could obtain financing for the facility. McKinnon asserts that for this reason "benchmark" requirements were included in the contract to make it a "no risk" venture for the state. In accordance with these requirements, Alpetco was not to receive any oil from the state until and unless the following occurred:

(1) Alpetco contained written commitments from others to "lend or invest" $1.5 billion in the project within eighteen months of the effective date of

the contract, i. e., by December 18, 1979);

(2) Alpetco obtained interim financing by that date;

(3) Alpetco expended $10 million on the project by that date;

(4) Alpetco completed a substantial amount of the preliminary work on the project by that date;

(5) Alpetco obtained sales contracts for 70% of the facility's output by that date;

(6) Alpetco expended or committed $100 million within 24 months of the effective date of the contract, i. e., by June 18, 1980; and

(7) Alpetco actually expended $100 million on the project before receiving any royalty oil.

As the eighteen-month benchmark deadline drew near, it became apparent that not all was going smoothly. The most troubling point concerned the first requirement, that Alpetco obtain written commitments from others to lend or invest $1.5 billion in the project. The plaintiffs contend that Alpetco did not meet this requirement because the commitments it had obtained were not "binding obligations." Alpetco submitted evidence to the state of what it considered to be compliance with the benchmark requirements.

The contract gave the Commissioner authority to extend the eighteen-month benchmark period six months. He chose to do so, over the objection of Alpetco, in order to evaluate whether the benchmark requirements had been met and to give Alpetco more time to comply with the requirements in the event Alpetco had not already done so. In February, 1980, the Commissioner determined that Alpetco had met the requirements within the eighteen-month period. He decided that the commitments for financing obtained by Alpetco

---

**4.** "In kind" refers to taking actual barrels of oil. "In value" refers to taking a monetary sum representing the value of the oil. Because certain costs are deducted by the producers when the royalty share is taken "in value," there is a preference for taking the oil "in kind." AS 38.05.182 provides that "royalties on oil and gas shall be taken in kind unless the commissioner determines that the taking in money would be in the best interest of the state [and the legislature does not revoke this determination by concurrent resolution]."

were sufficient because the contract did not require legally binding commitments, but only "business" commitments.

Sometime around this period, Alpetco altered its goals and decided to build merely a refinery rather than a petrochemical facility.[5] This, coupled with disagreement about whether Alpetco had obtained the financial commitments required by the contract, was not well received by some members of the legislature. The state asserts that even then there was a threat of litigation about the contract, which disturbed Alpetco. For whatever precise reason, a legislative committee suggested that the contract be amended to resolve some of the disagreements that had arisen.

After extensive negotiations, the following changes were finally agreed upon by Alpetco and the Royalty Board and approved by the Commissioner and the legislature:

(1) The benchmark requirements of the original contract were set aside in favor of just two requirements: by December 31, 1981, Alpetco was to have all financial matters resolved and it would be in the Commissioner's sole discretion to determine whether this requirement was met; and by March 1, 1986, Alpetco's facility was to be operational;

(2) Alpetco was to begin receiving royalty oil on July 18, 1980, as originally scheduled, but it would only receive 75,000 barrels a day until the facility was operational, at which time it would receive 100,000 barrels a day;

(3) The facility was to be able to handle 100,000 barrels of oil a day and it need not be a petrochemical facility;

(4) Alpetco's rights to future supplies of royalty oil were reduced.

Basically, the amendment seems to have been designed to lower the goals of the contract so as to make those goals more practicable.

Shortly after the amendment was approved in 1980, McKinnon filed his complaint in the superior court. McKinnon contended that the amendment is invalid and the contract is of no force or effect for the following reasons: first, at the time that the amendment was allegedly made, the original contract had already automatically terminated because Alpetco had failed to meet the benchmark requirements and, thus, there was nothing that could be amended; second, the amendment to the contract violated rules governing competitively bid contracts and thus was invalid; and third, contrary to statutory provisions, the Royalty Board failed to submit a report on the amendment to the legislature before the legislature voted to approve it, which rendered the amendment invalid.

Both sides filed motions for summary judgment. The superior court granted summary judgment for Alpetco and the state, holding that McKinnon did not have standing to maintain the action. In order to expedite resolution of the matter, the court also ruled on the merits of McKinnon's case. It concluded that the original contract was in effect at the time of the amendment and thus rejected McKinnon's first argument. It also concluded that the amendment was just that—an amendment—and not a new sale, exchange or other disposition of royalty oil. Thus, there was no need for the Royalty Board to submit a report to the legislature about the amendment because that requirement applies only to new sales, exchanges or other dispositions of royalty oil. It does not appear that the court ruled on McKinnon's second argument, that the amendment violated rules on competitively bid contracts. Nonetheless, we conclude that the court's granting of summary judgment to the state and Alpetco on the merits of the case was proper.[6]

5. There does not seem to be any consensus of opinion as to what a "petrochemical facility" is; however, all are in agreement that building a refinery plant is much less of an undertaking.

6. We choose not to address the issue of standing raised by the parties because the merits of this controversy are so clearly against McKinnon, who is asserting standing, and because

## II.

### VIABILITY OF ORIGINAL CONTRACT

█ The first argument we consider is whether the superior court erred in deciding that the original contract was in force and effect at the time the amendment was approved. McKinnon contends that the extension of time granted by the Commissioner to determine whether Alpetco had met the benchmark requirements of the contract was invalid. McKinnon also contends that the Commissioner abused his discretion when he later determined that Alpetco had met the requirements within the eighteen-month period specified in the contract. Finally, McKinnon contends that the contract automatically terminated before the amendment was approved because Alpetco had not met the benchmark requirements. McKinnon thus concludes that the amendment was invalid and the state has no contractual obligation or right to sell any royalty oil to Alpetco.

We think it is clear that the extension of time granted by the Commissioner was valid. We therefore need not consider whether the Commissioner was correct when he determined that Alpetco had met the benchmark requirements or whether the contract would have automatically terminated if Alpetco had not met the requirements.

The original contract specifically permitted the Commissioner to extend for six months the period within which Alpetco was to meet the "eighteen-month" benchmark requirements. Before the eighteen-month period elapsed, the Commissioner granted such an extension to give him and his staff sufficient time to determine whether Alpetco had met the requirements and to give Alpetco time to meet them in the event it had not done so. Until the six-month extension period elapsed, it was impossible for Alpetco to be in breach of contract or for the contract to automatically terminate due to any failure to meet the benchmark requirements because whether

or not this occurred could only be determined at the end of that period. Inasmuch as the amendment was approved before that time, it is apparent that the contract was in force and effect at the time of the amendment.

By the terms of another provision in the contract, compliance with the benchmark requirements could be held in abeyance during the time the legislature considered approving any amendments to the contract. McKinnon seems to argue that because an abeyance of performance could have been granted under this provision of the contract, it was improper for the Commissioner to grant a six-month extension under the other provision. We do not agree. Nothing in the contract suggests that when the provision for suspending performance can be utilized the provision for granting an extension cannot be used. If the parties intended this result, the contract could have been drafted to express it.

McKinnon also suggests that the Commissioner's extension was invalid because the contract was already "a dead letter" at the time the extension was granted. We reject this argument as well. Pursuant to its terms, the contract, as far as is relevant here, could not terminate until the eighteen-month period had elapsed. Even if there were some merit to McKinnon's assertion that Alpetco had not met the benchmark requirements by that time and could not do so in the foreseeable future, the contract remained viable until the last day of the eighteen-month period. The extension granted before that day was sufficient to keep the contract viable until the amendment was approved.

## III.

### BIDDING REQUIREMENT

We next consider whether the amended contract is invalid because the negotiation of the amendment violated the rules gov-

this case has been given expedited treatment at the request of McKinnon. *See, e. g., Edwards v. Carter*, 580 F.2d 1055, 1056 57 (D.C.Cir.

1978), *cert. denied*, 436 U.S. 907, 98 S.Ct. 2240, 56 L.Ed.2d 406 (1978); *Adams v. Vance*, 570 F.2d 950, 954 & n.7 (D.C.Cir.1977).

erning competitive bidding. We find this argument to be without merit because it erroneously assumes that competitive bidding was not properly waived by the Commissioner.

 Public contracts need not be competitively bid unless so required by constitution, statute, ordinance or regulation. *Libby v. City of Dillingham*, 612 P.2d 33, 44 (Alaska 1980) (Rabinowitz, J., concurring). When competitive bidding is not required, the state may contract by negotiation with a single party as long as the contract is not entered into in an arbitrary, capricious or fraudulent manner. *See, e. g., Hertz Drive-Ur-Self System, Inc. v. Tucson Airport Authority*, 81 Ariz. 80, 299 P.2d 1071 (1956); *Volume Services Division of Interstate United Corp. v. Canteen Corp.*, 369 So.2d 391, 395 (Fla.App.1979). No suggestion has been made that the state's contract with Alpetco was entered into in any of these manners.

The authority governing competitive bidding for this contract is AS 38.05.183(a), which provides in part:

The sale, exchange or other disposal of a mineral obtained by the state as a royalty ... shall be by competitive bid and the sale, exchange or other disposal made to the highest responsible bidder, except that competitive bidding is not required when the commissioner, with the prior written approval of the Alaska Royalty Oil and Gas Development Advisory Board where applicable, determines that the best interest of the state does not require it or that no competition exists.

Pursuant to this statute, the Commissioner specifically determined that it was not in the best interest of the state to competitively bid the original contract.[7] The Royalty Board approved this decision and thus competitive bidding was properly waived.

McKinnon's argument begins with the premise that, even though competitive bidding for the original contract was formally waived, the contract was still actually competitively bid upon and thus the procedures for competitive bidding attached to it. Competitive bidding refers to the process of selecting one bidder from many for a contract when the only variable between the bids is the price. Thus, AS 38.05.183(a) provides that the sale of royalty oil shall be made to the "highest responsible bidder." In the contract involved in this case, the only fixed item was the price at which the oil would be sold; all other items, *i. e.*, what the company would offer to do for the state in exchange, were variable. The Commissioner determined that the competitive bidding process could not be used for the multi-variable contract sought by the state. He determined that the state could get the most from the sale of its royalty oil by negotiating with companies that made proposals, rather than by competitive bidding. From this, McKinnon observes that the concept behind competitive bidding—getting the best deal—still existed, even though the precise format of competitive bidding was impracticable in this instance. McKinnon therefore concludes that, even though competitive bidding was formally waived, the contract should be treated as a competitively bid contract.

 The significance of this is that generally a government contract that was initially competitively bid cannot be materially amended because that is tantamount to forming a new contract, which should be accomplished by starting all over again with competitive bidding. *E. g., City of Miami Beach v. Klinger*, 179 So.2d 864 (Fla. App.1965); *Lasky v. City of Bad Axe*, 352 Mich. 380, 89 N.W.2d 520 (1958); *Terminal Construction Corp. v. Atlantic County Sewage Authority*, 67 N.J. 403, 341 A.2d 327 (1975); *Home Owners Construction Co. v. Borough of Glen Rock*, 34 N.J. 305, 169 A.2d 129 (1961); *Matter of Bayonne Park*, 168 N.J.Super. 33, 401 A.2d 705 (1979). Thus, McKinnon contends that it was impermissible for the state to negotiate the amendment to the contract with Alpetco because

7. The "best interest of the state" determination is reviewed by this court under the "reasonable basis" test and not the "independent judgment" test. *Champion Oil Co. v. Herbert*, 578 P.2d 961, 962–63 (Alaska 1978); *Kelly v. Zamarello*, 486 P.2d 906, 912–15 (Alaska 1971).

the amendment materially altered the contract; the state should either have left the contract as it was or started all over again with new bids.

■ Even if we were to accept McKinnon's argument, that the rules of competitive bidding somehow attach to a contract for which competitive bidding was formally waived, it would not necessarily follow that the negotiation of the amendment was invalid. Alpetco and the state respond that this would only place the state in the position of having to comply with AS 38.05.-183(a) again. By the terms of that statute, competitive bidding is only required for a "sale, exchange or other disposition" of royalty oil and the bidding may be waived if it is in the best interest of the state or if no competition exists. At the time the amendment was proposed, the Commissioner explained that he did not believe the amendment constituted a new sale of royalty oil because the amendment had the effect of *reducing* the amount of oil sold to Alpetco to 75,000 barrels a day. The Commissioner nonetheless indicated that out of an abundance of caution he would waive competitive bidding on the bases that it was in the best interest of the state and that no competition existed. He determined that competitive bidding was not in the best interests of the state for the same reason that it was not for the original contract—it was still a multi-variable contract. He decided that no competition existed because he believed that only Alpetco could "bid" on the amended contract, inasmuch as Alpetco already had exclusive rights to this oil under the original contract. The Royalty Board approved the waiver of competitive bidding. We conclude that the initial waiver of competitive bidding and the second waiver at the time of the amendment removed any obligation to open the contract to competitive bidding.

## IV.

## ROYALTY BOARD'S REPORT TO LEGISLATURE

■ AS 38.06.055(a) provides, in part, that no sale, exchange, or other disposition of oil may be made by the Commissioner without the prior approval of the legislature. With respect to this legislative approval, AS 38.06.070(c) provides:

> The board shall make a full report to the legislature on each criterion specified in (a) or (b) of this section for any disposition of royalty oil or gas which requires' legislative approval. The board's report shall be submitted for legislative review at the time of [sic] resolution for legislative approval of a proposed disposition of royalty oil or gas is introduced in the legislature.

It is undisputed that the Royalty Board did not prepare any report for the legislature before or after the time the amendment was introduced to the legislature for approval. McKinnon argues that this violated AS 38.06.070(c) and therefore the amendment is void.

The superior court decided that "the amendment was, in fact, just that, an amendment, not a new sale . . . ." We agree. The contract itself anticipated future amendments and provided:

> This Agreement may be supplemented, amended or modified only by a written instrument duly executed by both the parties hereto after *proper prior authorization*, including approval by the Alaska Royalty Oil & Gas Development Advisory Board and the Alaska State Legislature. Buyer [Alpetco] agrees that in the event Article VIII of this Agreement is subsequently amended so as to materially reduce the consideration paid to the Seller [State], directly or indirectly, for the royalty oil, said amendment will only be effective after it has been approved by a direct vote of the people of the State of Alaska. [Emphasis added.]

"Proper prior authorization" did not contemplate compliance with statutory procedures, but instead indicated that pursuant to the contract any amendments would first have to be approved by the Royalty Board and the legislature, as occurred.

The most significant changes effectuated by the amendment to the contract were

that the quantity of oil to be delivered to Alpetco was reduced by 75,000 and, for a later period, 50,000 barrels per day and that the delivery of oil was to commence before Alpetco had resolved all financing problems. The reduction in the amount of oil does not constitute a "sale, exchange or other disposition" of royalty oil; this phrase could be reasonably interpreted only to refer to an increase in the amount of oil to be delivered to Alpetco. McKinnon argues that the earlier delivery to Alpetco constituted a new sale because by the terms of the agreement title to the oil does not pass until delivery. This overlooks, however, the fact that Alpetco has had a contractual, albeit future, interest in this oil since 1978 when the original contract was formed. Alpetco refers us to 11 AAC 03.250(3), which interprets the statutory requirements pertaining to new sales, exchanges or other dispositions of royalty oil as applying to the amendment of contracts only when the delivery of additional oil is required by the amendment. This regulation did not become effective until December 17, 1980, and thus is not controlling in this case; however, it reflects a sound analysis of the statutes.

We conclude that the amendment was properly entered into and is valid. The original contract was still in effect at the time of the amendment because the Commissioner had validly extended for six months the deadline for compliance with the eighteen-month benchmarks; thus there was a contract that could be amended. Negotiation of the amendment did not violate the rules governing competitively bid contracts because the Commissioner had validly waived competitive bidding for the original contract and for the amendment. Finally, the failure of the Royalty Board to submit a report to the legislature before it voted whether or not to approve the amendment was irrelevant because such a report is only required when the legislature is approving a sale, exchange or other disposition of royalty oil and the amendment did not constitute a new sale or disposition of royalty oil.

The judgment of the superior court is AFFIRMED.